# EXHIBIT "C"

## MASTER CREDIT AGREEMENT

This Master Credit Agreement (referred to herein as the "Agreement" or the "MCA") is dated as of August 9, 2018 between EASTERDAY FARMS PRODUCE, CO., a Washington corporation ("Easterday Farms Produce"); 3E PROPERTIES, a Washington general partnership ("3E Properties"); GALE ALLEN EASTERDAY ("Gale Easterday") and KAREN LOUISE EASTERDAY ("Karen Easterday"), married spouses; CODY ALLEN EASTERDAY ("Cody Easterday") and DEBBY EASTERDAY ("Debby Easterday"), married spouses; and JODY DEE EASTERDAY ("Jody Easterday") and ANDREW H WILLS ("Andrew Wills"), married spouses (Easterday Farms Produce; 3E Properties; Gale Easterday; Karen Easterday; Cody Easterday; Debby Easterday; Jody Easterday; and Andrew Wills are herein individually and collectively, "Party") and RABO AGRIFINANCE LLC, a Delaware limited liability company ("Lender").

This Master Credit Agreement is an amendment and restatement of the terms and conditions of Lender's loan or credit facility as evidenced by that certain Credit Agreement dated September 4, 2009, as amended to the date hereof; that certain Adjustable Interest Rate Promissory Note dated June 19, 2008, as amended; that certain Adjustable Interest Rate Promissory Note dated September 4, 2009, as amended; and that certain Operating Line of Credit Note dated September 4, 2009, as amended (individually and collectively the "Existing Loan"). This Credit Agreement does not release or extinguish the indebtedness, liabilities and Obligations of the Borrower under the Existing Loan(s). All Liens and security interests in any real or personal property granted to or for the benefit of Lender for purposes of securing the Existing Loan(s) also secure the Obligations; and Borrower reaffirms the terms and provisions of any mortgage, deed of trust, security agreement or other instrument or agreement under which any such Lien or such Lien or security interest has been granted to Lender. BORROWER RELEASES LENDER, AND LENDER'S SUBSIDIARIES, AFFILIATES, OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, SERVANTS, ATTORNEYS, AND REPRESENTATIVES (COLLECTIVELY, THE "RELEASED LENDER PARTIES") FROM ANY AND ALL LOSSES, DEFENSES, OR OFFSETS WHICH BORROWER EVER HAD, OR NOW HAS AGAINST THE RELEASED LENDER PARTIES, JOINTLY OR SEVERALLY, FOR OR BY REASON OF ANY MATTER, CAUSE, OR THING WHATSOEVER, WHICH RELATES TO, IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY TO THE EXISTING LOAN(S).

## ARTICLE 1 - THE FACILITY SHEETS

**1.01    Facility Sheets.** Lender has agreed, subject to the terms of this Agreement, to make one or more credit facility(ies) available to Party under the terms and conditions of one or more Facility Sheet(s), which are incorporated herein. Lender may in the future and at its sole option make additional credit facilities available to Party which by their terms will be governed by this Agreement and a separate Facility Sheet(s). Upon and in the event Lender enters into any Facility Sheet with any Party that specifically references this MCA, the term "Agreement" as used in the Facility Sheet or any exhibit or schedule in connection therewith, shall be deemed to include this MCA as well as such Facility Sheet.

## ARTICLE 2 – SCHEDULE OF DEFINITIONS AND COVENANTS

**2.01    Schedule of Definitions and Covenants.** This Agreement is also entered with reference to a Schedule of Definitions and Covenants. Party hereby acknowledges Party has received and reviewed the Schedule of Definitions marked as Exhibit A via paper copy, electronic copy, electronic mail, or by accessing the Schedule of Definitions with the version number that matches the version number shown in the footer of this Agreement at https://www.raboag.com/about-us/scheduledefinitions-167. Lender and Party agree the Schedule of Definitions is hereby incorporated by reference. The Applicable Obligor Covenants Schedule is attached hereto and incorporated herein by reference as Exhibit B. Party agrees to the Schedule of Definitions and Covenants and the Applicable Obligor Covenants Schedule. Capitalized terms contained in this Agreement are used as defined in the Schedule of Definitions and Covenants. Some of or all of the capitalized terms defined in the Schedule of Definitions and Covenants are used in this Agreement, the Applicable Obligor Covenants Schedule and the Facility Sheet(s). To the extent any term is defined in the Schedule of Definitions and Covenants but is not used in this Agreement, the Applicable Obligor Covenants Schedule, any Facility Sheet, or any amendment, modification or supplement to this Agreement, such term shall be disregarded, of no meaning and without any effect. Except as otherwise defined in this Agreement or in the Schedule of Definitions and Covenants, or unless the context otherwise requires, each term that is used in this Agreement which is defined in Article 9 of the UCC shall have the meaning ascribed to that term in Article 9 of the UCC. If a term is defined in an Applicable Obligor Covenants Schedule, Facility Sheet, Schedule of Covenants, or Other Schedule differently than in the Schedule of Definitions and Covenants, then the definition in each such Facility Sheet, Schedule of Covenants, or Other Schedule will control for the purposes of that schedule and that schedule only.

## ARTICLE 3 - COVENANTS UNDER THE FACILITY SHEETS

**3.01    Computation of Interest.** All computations of accrued interest under all Loan Documents other than interest at the Maximum Rate, and all fees under all Loan Documents, will be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) elapsed. Except as set forth in a Facility Sheet, there is no limit on the amount that an Interest Rate subject to Adjustment by Lender may increase at any one time, or in the aggregate. Lender's determination of an Interest Rate will be conclusive, absent manifest error.

**3.02    Adjustment of Long Term Adjustable Rate.** Lender shall notify Party of any Adjustment of a Long Term Adjustable Rate not less than 30 days before the Long Term Adjustable Rate Adjustment Date. At any time prior to that Long Term Adjustable Rate Adjustment Date, Party may deliver a Notice of Election to Prepay. If Lender receives an Election to Prepay, the entire amount of the principal indebtedness accruing interest at the Long Term Adjustable Rate shall be Prepaid without Prepayment Fee on or before that date which is 90 days after the Long Term Adjustable Rate Adjustment Date. If Lender does not receive a Notice of Election to Prepay, then Party may, but is not obligated to Prepay all or any part of the principal indebtedness accruing interest at the Long Term Adjustable Rate without Prepayment Fee, on or before the Long Term Adjustable Rate Adjustment Date.

**3.03    Late Fee.** At Lender's option in each instance, to the extent permitted by Applicable Law, Party shall pay on demand a late fee in the amount of 5.000% of the amount of any scheduled payment due prior to the Maturity Date, which is not paid in full when due. The imposition and payment of a late fee will not constitute a waiver of Lender's rights with respect to an Event of Default as a result of that late payment.

**3.04    Default Rate.** Upon the occurrence of an Event of Default, the principal balance of Loan and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default until the date Lender notifies Borrower that it is waived or cured or all Loan Obligations are paid in full, bear interest at the Default Rate, subject to the provisions of the Schedule of Definitions and Covenants, the Applicable Obligor Covenants Schedule and the applicable Facility Sheet. The provisions of this section may result in compounding of interest. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

**3.05    Maximum Rate.** Notwithstanding any provision of this Agreement to the contrary, (a) no interest will be due on any amount due under this Agreement if, under Applicable Law, Lender is not permitted to charge interest on that amount, and (b) in all other cases interest due under this Agreement will be calculated at a rate not to exceed the Maximum Rate. If Party is requested by Lender to pay interest on any amount due under this Agreement at a rate greater than the Maximum Rate, the amount of interest due on that amount will be deemed the Maximum Rate and all payments in excess of the Maximum Rate will be deemed to have been Prepayments without Prepayment Fee or penalty, and not interest. All amounts other than interest which are paid or agreed to be paid to Lender for the use, forbearance, or detention of Party's indebtedness to Lender under this

Agreement shall, to the extent permitted by Applicable Law, be amortized over the full stated term of the indebtedness, so that the rate of interest on account of that indebtedness does not exceed the Maximum Rate for so long as the indebtedness is outstanding.

3.06    **Method and Application of Payments**. All payments of principal, interest, and other amounts to be made under any Loan Documents shall be made to Lender in U.S. dollars and in immediately available funds, without set-off, deduction, or counterclaim, not later than 2:00 pm (St. Louis, Missouri time) on the dates on which those payments will become due (any of those payments made after that time on the due date will be deemed to have been made on the next succeeding Business Day). All payments received by Lender (including, to the extent permitted by Applicable Law, all proceeds received from the sale or other liquidation of the Collateral) will be applied to the Obligations in any order determined by Lender. The early or late date of making a regularly scheduled payment will be disregarded for purposes of allocating the payment between principal and interest. For this purpose, the payment will be treated as though made on the date due. In any legal action or proceeding, the entries made by Lender in an account or accounts maintained by Lender or Rabobank or any of their Affiliates in accordance with its usual practice and evidencing the Obligations, will be *prima facie* evidence of the existence and amounts of those Obligations.

3.07    **Prepayments Generally**. The Prepayment of principal on any Loan shall be subject to the Prepayment Options that are set forth in the Facility Sheet applicable to such Loan. Lender may refuse to accept any Prepayment not expressly permitted in the Loan Documents. If a Prepayment is conditioned upon a Notice of Election to Prepay or other prior notice to Lender, at the option of Lender, (a) that Notice of Election to Prepay or notice will be irrevocable; (b) Prepayment will be due in the amount and on the date specified in that Notice of Election to Prepay or notice; and (c) that Notice of Election to Prepay or notice will not affect Parties obligation to make all other payments required under the Loan Documents on the date when due. If Lender receives any Prepayment which it is permitted to refuse, Lender may accept Prepayment; except that Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid would be due whichever is earlier. Each Prepayment of a portion of a Loan will be applied to the most remote payment of the principal due under a Facility Sheet for which such Prepayment is designated and as may be permitted under such Facility Sheet.

3.08    **Reporting Requirements**. Lender may, from time to time, ask for various reporting and other such documentation from each Party to the Agreement regarding the operations, business, corporate affairs and financial condition, including without limitation financial, tax, and other corporate records reporting. Said reporting and/or documentation requests will be made by Lender in its sole and absolute discretion. Except where such reports shall be delivered within a different time period, each Party will be required to provide Lender with the requested reporting within 30 days of the receipt of written notice from Lender. Financial reporting, if any, will be at least of the quality specified in the notice and may be (i) tax returns, (ii) self-prepared financial statements, (iii) CPA Compiled statements, (iv) CPA Reviewed statements and/or (v) CPA Audited statements each based upon either US GAAP or FFSC reporting as also specified in the notice.

3.09    **Mandatory Repayments**. If at any time the unpaid principal balance of any Loan exceeds the Maximum Amount thereof under the terms of this Agreement, then, subject to a Permitted Over-Advance for such Loan, upon demand by Lender, Party shall repay that portion of the principal balance thereof in excess of that Maximum Amount, along with all unpaid accrued interest on that portion.

3.10    **Aggregate Borrowing Base**. In no event shall any Borrowing Base Certificate submitted hereunder, include any Eligible Collateral (as such term is defined in a Facility Sheet) that are also included in another Facility Sheet Borrowing Base.

## ARTICLE 4 - COLLATERAL

4.01    **Collateral Documents**. The payment and performance of the Obligations are secured by those Liens in favor of Collateral Agent as agent for the Lender pursuant to the Collateral Agency Agreement created under (i) any Security Instrument now or hereafter entered into by Party in favor of Collateral Agent, which states that it secures all or any of the Obligations; (ii) any other instrument or agreement now or hereafter delivered to Lender and/or Collateral Agent in conjunction with this Agreement, which states that it secures all or any of the Obligations; and (iii) any Cross Collateralized Loan Documents, if applicable.

4.02    **Due on Sale or Encumbrance Provisions**. Each Mortgage shall include a provision similar to the following, with applicable terms to be revised as the context requires: Parties shall not make or permit any Prohibited Transfer. Upon Lender's or Beneficiary's election, whichever is applicable, any Prohibited Transfer shall be an Event of Default, permitting Lender/Beneficiary and/or Collateral Agent to declare all of the Secured Obligations to be due and payable immediately.

## ARTICLE 5 - LOAN OPENING AND FUNDING CONDITIONS

5.01    **Loan Opening Conditions**. Lender's obligation to make a Loan is subject to satisfaction of the following Loan Opening Conditions and receipt by Lender of the following items, each as determined by Lender in Lender's sole and absolute discretion:

(a)    **No Event of Default**. No Event of Default or condition which with the giving of notice or passage of time would be an Event of Default exists under this Agreement;

(b)    **Fully Executed Agreement**. Lender shall have received a completed and executed Agreement;

(c)    **Fully Executed Facility Sheet**. Lender shall have received a completed and executed Facility Sheet.

(d)    **Fully Executed Loan Documents**. Loan Documents applicable to the Loan Type and executed by Party and any other Parties, all as set forth in this Agreement or the Facility Sheet applicable to the Loan Type;

(e)    **Amendments to Cross Collateralized Loan Documents**. Amendments to Cross Collateralized Loan Documents to the extent, if any, required by Lender for purposes of securing the Loan Obligations;

(f)    **Organizational Evidence**. Evidence (i) of the formation, existence and good standing of all Parties to the Transaction Documents other than Lender which are anything other than an individual, if any, and authorization of the individuals executing the Transaction Documents on behalf of those Parties, (ii) to the extent required by Lender or by Applicable Law such information that Lender may require to determine who the ultimate beneficial owner of any or all the Parties; (iii) that there has been no material change in the management and/or ownership structure of any Party since the date on which the application for the applicable Loan was submitted;

(g)   **Financial Evidence.** Evidence there has been no Material Adverse Effect as to any Party since the effective date of the Financial Information provided to Lender.

(h)   **Appraisals and Reports.** All Appraisals and inspection reports required by Lender;

(i)   **Environmental Information.** Environmental Information establishing compliance with all applicable Environmental Laws;

(j)   **Regulatory Compliance.** Evidence that all regulatory approvals, Permits and licenses required under Applicable Law for Party's business operations have been issued and are in full force and effect;

(k)   **Validity of Liens.** Evidence that the Liens granted to Lender under the Collateral Documents are valid, enforceable, properly perfected, and prior to the rights and interests of all other Persons, except those rights and interests acceptable to Lender;

(l)   **Title Evidence.** Evidence that all policies of title insurance, opinions of title and endorsements required by Lender or under the Loan Documents have been issued and are in full force and all premiums and charges for those policies, opinions and endorsements have been paid;

(m)   **Representations and Warranties.** All representations and warranties of all Parties in the Transaction Documents are true and correct;

(n)   **Legal Opinion.** To the extent required by Lender, a written opinion from Parties' and Guarantor's (if any) legal counsel acceptable to Lender, covering all issues required by Lender;

(o)   **Payment of Fees and Costs.** Payment to Lender of all fees and costs set forth in this Agreement;

(p)   **Reimbursement of Appraisal Expenses.** Reimbursement of Lender's Appraisal Expenses;

(q)   **Reimbursement of Closing Expenses.** Reimbursement of Closing Expenses;

(r)   **Collateral Ownership.** If any Collateral is not owned by the Party, Party must cause all individuals or entities who own such Collateral to enter into this Agreement; and

(s)   **Preconditions.** All other documents, information and other preconditions required by Lender, including, but not limited to, confirmation that Party is in compliance with all covenants set forth in this Agreement.

**5.02   Loan Funding Conditions.** Lender's obligation to disburse funds under a Loan is subject to satisfaction of all other requirements and conditions set forth in this Agreement, the Applicable Obligor Covenants Schedule and in the Facility Sheet in connection with the Loan, as determined by Lender in Lender's sole and absolute discretion.

## ARTICLE 6 – PARTY REPRESENTATIONS

**6.01   Representations.** Party represents (collective, the "Party Representations") to Lender that:

(a)   **Good Standing.** If Party is anything other than an individual, Party was duly formed, is validly existing and in good standing and qualified to do business in its state of organization and each state in which it conducts its business;

(b)   **Due Power and Authority.** The execution, delivery and performance by Party of each Transaction Document to which it is a Party, is within the powers and authority of Party and has been duly authorized;

(c)   **No Conflict with Applicable Law.** To Party's knowledge, the Transaction Documents do not conflict with any Applicable Law;

(d)   **Enforceability.** Each Transaction Document is a legal, valid and binding obligation of Party, enforceable against Party in accordance with its terms, and any Transaction Document, instrument or agreement required thereunder, when executed and delivered to Lender, will be similarly legal, valid, binding and enforceable;

(e)   **Financial Information.** All Financial Information delivered to Lender in connection with Party's application for a Loan, Lender's underwriting and approval of the Loan, or this Agreement and the other Loan Documents, are accurate, correct and sufficiently complete in all material respects to provide Lender true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities;

(f)   **Utilities.** All Utilities necessary and appropriate for the conduct of the business of Party are available or Party has taken all steps necessary to assure that all utility services so required will be available upon commencement of the business of Party;

(g)   **Roads.** All Roads necessary for the completion, occupancy and operation of Party's business have either been completed or the necessary easements or rights-of-way therefor have been acquired or dedicated to public use, and all necessary steps have been taken by Party to ensure their completion no later than the date they will be needed for operation of Party's business or any earlier date required by any Governmental Authority or Applicable Law;

(h)   **Permits.** All Permits have been obtained, or, to the extent not obtained, no information or fact exists that would reasonably cause Party to believe that all Permits required to construct, occupy, and operate Party's business will not be readily obtainable prior to the commencement of Party's applicable business;

(i)   **No Material Adverse Effect.** There has been no Material Adverse Effect as to Party since the effective date of the Financial Information provided to Lender;

(j)   **No Judgment.** Party is not the subject of any Judgment; and there is no lawsuit, tax claim or other dispute pending or to Party's knowledge threatened against Party that, if determined adverse to Party, is reasonably likely to have a Material Adverse Effect;

(k) **No Conflicts.** The Transaction Documents do not conflict with, nor is Party in default under any agreement or arrangement in effect providing for or relating to extensions of credit in respect of which Party is in any manner directly or contingently obligated;

(l) **Tax Returns.** Party has filed all tax returns (federal, state, and local) required to be filed by Party and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties;

(m) **Applicable Laws Compliance.** Party is in compliance with all Applicable Laws (including all Environmental Laws), and there is no claim, action, proceeding or investigation pending or to Party's knowledge threatened against Party with respect to a violation of Applicable Law by Party;

(n) **Non-Foreign Person.** Party is not a foreign person within the meaning of Section 1445 of the Internal Revenue Code of 1986; and

(o) **No Event of Default.** There is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

6.02 **Information Accurate and Complete.** Party's submission of any report, record or other information pertaining to the condition or operations, financial or otherwise, of Party, from time to time, whether or not required under this Agreement, will be deemed accompanied by a representation by Party that the report, record or information is complete and accurate in all material respects as to the condition or operations of Party (and, if applicable, Party's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities.

## ARTICLE 7 – PARTY COVENANTS

Until such time as all Obligations have been paid in full and Lender has no obligation to make any additional advance under any Loan (if applicable), Party (or the Person or Persons as may be specifically named in any of the Covenants or Reporting Requirements) agrees to and makes the Covenants set forth in this MCA:

7.01 **Books and Records.** Party shall maintain and cause each of its Subsidiaries to maintain proper books of record and account including full, true, and correct entries of all dealings and transactions relating to its and their business and activities, in all material respects in conformity with GAAP.

7.02 **Change in Accounting.** Party shall not make any material change or modification of Party's manner and method of accounting except as required by the applicable accounting standard.

7.03 **Maintenance of Assets.** Party shall maintain and preserve all rights, privileges, and franchises Party now has; and make any repairs, renewals, or replacements to keep Party's properties in good working condition.

7.04 **Landlord Agreement.** Upon request by Lender, for any personal property Collateral located on real property which is not owned by Party (or the grantor of the security interest in favor of Lender), Party shall obtain an agreement in favor of Lender signed by the owner of the real property and the holder of any mortgage or deed of trust on the real property, waiving any of their rights in the Collateral and permitting Lender's removal thereof from the real property.

7.05 **Mortgage Agreement.** Upon request by Lender, for any personal property Collateral located on real property which is subject to a mortgage or deed of trust in favor of a Person other than Lender, Party shall obtain an agreement in favor of Lender signed by the holder of the mortgage or deed of trust on the real property, waiving any of their rights in the Collateral and permitting Lender's removal thereof from the real property.

7.06 **Existence and Good Standing.** If Party is anything other than an individual, Party shall preserve and maintain its existence and good standing in the jurisdiction of its formation, and qualify and remain qualified to conduct its business in each jurisdiction in which such qualification is required;

7.07 **Change in Business or Organizational Structure.** Party shall not engage in any material line of business substantially different from, or unrelated to, those lines of business conducted by Party and its Subsidiaries on the date hereof; and if Party is anything other than an individual, Party shall not (a) form or otherwise acquire any Subsidiary, unless that Subsidiary executes and delivers to Lender a Guaranty of all of the Obligations and all other instruments and agreements required by Lender; (b) merge, dissolve, liquidate, consolidate with or into another Person, or dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person; or (c) change its name, identity or business structure or the location(s) of (A) Party's place of business or Party's chief executive office if Party has more than one place of business, (B) Party's state of organization.

7.08 **Compliance with Laws.** Party shall comply in all respects with all Applicable Laws and pay before delinquency, all taxes, assessments, and governmental charges imposed upon Party or its property.

7.09 **Inspections.** Party shall, at any reasonable time and from time to time, permit Lender or any of its agents or representatives to examine and make copies of and abstracts from the records and books of, and visit the properties of, Party and to discuss the affairs, finances, and accounts of Party with (if Party is other than an individual) officers, directors, partners, or managers or Party, as applicable; Party's independent accountants; and any other Person dealing with Party.

7.10 **Insurance.** Party shall maintain, or cause to be maintained, all insurance policies and any such additional insurance as required by Lender or any Swap Counterparty from time to time. All policies of insurance required must be issued by companies approved by Lender and the Swap Counterparties, and must be acceptable to Lender and the Swap Counterparties as to amounts, forms, risk coverages, deductibles, expiration dates, and loss payable and cancellation provisions. In addition, each required policy must contain such endorsements as Lender or the Swap Counterparties may require and must provide that all proceeds be payable to Lender and the Swap Counterparties to the extent of their respective interests. If and whenever Lender or a Swap Counterparty believes that any required insurance is not in effect, Lender or that Swap Counterparty may (but will not be obligated to) procure that insurance at Party's expense. Party shall reimburse Lender and the Swap Counterparties, on demand, for all premiums on that insurance paid by Lender or the Swap Counterparties, respectively. If any Real Estate is located in an area now or hereafter designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Borrower agrees to obtain and maintain Federal Flood

Insurance, if available, within 45 days after notice is given by Lender that the Real Estate is located in a special flood hazard area, for the lesser of 1) the full unpaid principal balance of the Loan, plus Swap Counterparties' derivative exposure under the Hedging Agreements as calculated by Swap Counterparties, plus any prior Lien on the property securing the Loan, 2) the total replacement value of any structure located in the flood hazard area, or 3) the maximum amount available under the National Flood Insurance Program for the particular type of property, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the Loan.

**7.11    Arms' Length Dealing.**    Except for *de minimis* transactions, Party shall not enter into any transaction of any kind with any family member, Subsidiary or Affiliate of Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to Party as would be obtainable by any Party at the time in a comparable arm's length transaction with a Person other than a family member, Subsidiary or Affiliate of Party.

**7.12    Use of the Loan.**    Party shall not use the Loan (a) for personal, family or household purposes, or (b) to purchase or carry margin stock or to invest in other Persons for the purpose of carrying any such margin stock or to reduce or retire any indebtedness incurred for that purpose or for any illegal activity.

**7.13    ERISA Plans.**    Party shall promptly pay and cause all Subsidiaries to pay contributions adequate to meet not less than the minimum funding standards under ERISA with respect to each and every Plan; file each annual report required to be filed pursuant to ERISA in connection with each Plan for each year; and notify Lender within ten days following the occurrence of any Reportable Event that might constitute grounds for termination of any capital Plan by the Pension Benefit Guaranty Corporation or for the appointment by the appropriate United States District Court of a trustee to administer any Plan. Capitalized terms in this section shall have the meanings defined within ERISA.

**7.14    Legal Fees; Costs.**    Party shall pay the following:  (a) costs, expenses and Legal Fees paid or incurred in connection with the collection or enforcement of the Transaction Documents, whether or not suit is filed; (b) costs and Legal Fees paid or incurred in connection with any Insolvency Proceeding involving a claim under the Transaction Documents; (c) costs, expenses and Legal Fees incurred to protect the Lien and security interests under the Collateral Documents; including but not limited to appraisals, inspections, insurance premiums, and the prevention of waste; and (d) costs of suit and such sum as the court may adjudge as Legal Fees in any action to enforce payment of the Notes or any part thereof.

**7.15    Other Acts.**    Upon request by Lender, Party shall cooperate with Lender for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien granted under this Agreement or the Collateral Documents, or to carry out the intent of the Transaction Documents.

**7.16    Reporting Requirements.**    Party shall furnish to Lender notice of the occurrence of any of the following, promptly, but in any event no later than five days after such occurrence: (i) any lawsuit, tax claim or other dispute if filed or threatened against Party in an amount greater than $100,000.00; (ii) any substantial dispute between Party and any Governmental Authority; (iii) the failure by Party to comply with the terms and provisions of this Agreement; (iv) any Material Adverse Effect as to Party; or (vi) any change in Party's name, legal structure, place of business, or executive office, including any change from Party's previous reports of: (x) any individual who owns, directly or indirectly, 25 percent or more of the equity interest of the legal entity that is a Party to this Agreement (e.g., each individual who owns 25 percent or more of the shares of a corporation), and (y) any single individual with significant responsibility for managing the legal entity that is a Party to this agreement (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer), and, as to both (x) and (y), such new individual's name, address, date of birth, and Social Security number (or passport number or other similar information, where applicable).

## ARTICLE 8 - REMEDIES

Upon the occurrence of an Event of Default, Lender may: (a) without notice to Party, decline any Request for Advance; (b) declare all Loan Obligations immediately due and payable, without presentment, notice of intent to accelerate or notice of acceleration, demand, protest or further notice of any kind, all of which are expressly waived by Party; and (c) exercise all other rights and remedies afforded to Lender under any or all Loan Document or Applicable Law or in equity; except that upon an actual or deemed entry of an order for relief with respect to Party or any of its Subsidiaries in any Insolvency Proceeding, (i) any obligation of Lender to make any additional advance under any Loan, other than all or any portion of any Loan already advanced by Lender pursuant to the terms and conditions herein, shall automatically be terminated and (ii) all Loan Obligations shall automatically become due and payable, without presentment, demand, protest or any notice of any kind, all of which are expressly waived by Party.

## ARTICLE 9 - NOTICES

All Notices between the Parties must be in writing and mailed or delivered to the address specified in that Loan Document, or to the address designated by any Party in a notice to the other Parties; and in the case of any other Person, to the address designated by that Person in a notice to Party and Lender. All Notices will be deemed to be given or made upon the earlier to occur of (a) actual receipt by the intended recipient or (b) (i) if delivered by hand or by courier, upon delivery; or (ii) if delivered by mail, four Business Days after deposit in the mails, properly addressed, postage prepaid; except that Notices and other communications to Lender shall not be effective until actually received by Lender.  Party requests that Lender accept, and Lender may, at its option, accept and is entitled to rely and act upon any Notices purportedly given by or on behalf of Party, even if not made in a manner specified herein (including Notices made verbally, by telephone, facsimile, email, or other electronic means of communication), were incomplete or were not preceded or followed by any other form of Notice specified herein, or the terms thereof, as understood by the recipient, varied from any confirmation thereof.  All telephonic Notices to and other telephonic communications with Lender may be recorded by Lender, and each Party consents to such recording.

## ARTICLE 10 – ACCOUNTING MATTERS AND DRAFTING CONVENTIONS

**10.01    Accounting Matters.**    All accounting terms not specifically defined herein or in the Schedule of Definitions and Covenants will be construed in accordance with GAAP or FFSC, at Party's option.  All financial covenants applicable to an individual will be calculated based on that individual's business, excluding personal assets and liabilities.  Party will not change (a) the accounting standards used to prepare Party's financial statements or (b) the manner in which either the last day of its fiscal year or the last days of the first three fiscal quarters of its fiscal years is calculated. If at any time any change in GAAP or FFSC would affect the computation of any financial ratio or requirement set forth in any Loan Document, Lender may amend that ratio or requirement to preserve the original intent thereof in light of that change.

**10.02    Drafting Conventions.**    Unless expressly stated therein or the context otherwise requires, all Loan Documents will be interpreted in accordance with the Drafting Conventions,

## ARTICLE 11 – GENERAL TERMS AND CONDITIONS APPLICABLE TO ANY LOAN AND LOAN TYPE

**11.01    Loan Documents.** Each Loan shall be evidenced by a Note and any other Loan Documents Lender so requires. The form, substance and enforceability (substantiated by an opinion of Party's counsel, if requested) of all Loan Documents required by Lender must also be satisfactory to Lender's counsel and all Loan Documents will contain terms and conditions not set forth in this Agreement and required by Lender for the Loan Type contemplated by this Agreement and the applicable Facility Sheet.

**11.02    Compliance With Conditions.** Lender shall have received such evidence of compliance with the Loan Opening Conditions and such other due diligence items as Lender or its counsel may reasonably require.

**11.03    Obligation to Borrow and Lend.** Party's obligation to borrow and Lender's obligation to lend any Loan hereunder shall be conditioned upon the execution and delivery by Party and Lender of this Agreement, a Facility Sheet and the satisfaction of all Loan Opening Conditions set forth in this Agreement. Lender shall be under no obligation to lend and Party shall be under no obligation to borrow unless and until both this Agreement and a Facility Sheet are approved by Lender in Lender's sole and absolute discretion and executed by both Lender and Party.

**11.04    Requests for Advances.** Each Request for Advance will be irrevocable and is a representation by Party to Lender that, if applicable, the unpaid principal balance of that Loan after disbursement of the requested Loan will not exceed the Maximum Amount of such Loan under this Agreement. Each time Party makes a Request for Advance, Party reaffirms and re-makes all of the Party Representations and acknowledges and agrees to all of the Covenants and Reporting Requirements set forth in the Applicable Obligor Covenants Schedule, any Facility Sheet as of the date of the Request for Advance by Party. Lender may postpone making any advance on any Loan to the extent Lender is delayed by fire, earthquake or another circumstance outside Lender's reasonable control.

**11.05    Optional Rates.** If Party is granted such an option hereunder, Party may from time to time elect (i) a Rate Conversion, or (ii) a LIBOR Rate Continuation, subject to the Optional Rate Conditions.

**11.06    Designated Account.** So long as Lender has any obligation to make any advance on any Loan or any Loan Obligations or any portion of any Loan remains unpaid or unsatisfied, upon the request of Lender, Party shall maintain a Designated Account demand deposit account with RNA, or another bank approved by Lender in good standing. If all of the applicable conditions to a Loan have been fulfilled, Lender shall make the Loan available to Party as set forth herein by, at the option of Lender, (a) depositing the proceeds in the Designated Account; (b) if applicable, transferring the proceeds to an agent designated for purposes of an escrowed Closing of this transaction by wire or ACH transfer; or (c) paying or applying the proceeds as otherwise permitted under this Agreement, by any means appropriate under the circumstances.

**11.07    ACH Payments.** Party authorizes Lender to, at Lender's option in each instance, to initiate ACH Payments from the Designated Account. If Lender elects to initiate ACH Payments, Party will thereafter maintain sufficient funds in the Designated Account on the dates Lender enters debits for ACH Payment regularly scheduled payments of interest, principal, and fees, if any. If there are insufficient funds in the Designated Account on the date Lender enters any debit authorized by this Agreement, Lender may reverse the debit or may accept the partial payment without prejudice to Lender's right to receive all amounts due and owing. Party agrees to upon request by Lender, execute and deliver to Lender an ACH Payment authorization in form and content satisfactory to Lender.

**11.08    Prepayment Conditions.** The Prepayment of principal on any Loan shall be subject to the Prepayment Conditions.

**11.09    LIBOR Rate Loan Indemnification.** Upon Lender's commitment or funding of any LIBOR Rate Loan to Party, Party agrees to indemnify Lender and to hold Lender harmless from any loss or expense which Lender may sustain or incur as a consequence of (a) failure by Party to borrow pursuant to any such LIBOR Rate Loan, or to execute a LIBOR Rate Conversion or a LIBOR Rate Continuation after Party has requested any of the same in accordance with the provisions of this Agreement, (b) default by Party in a borrowing of a LIBOR Rate Loan, a LIBOR Rate Conversion, or a LIBOR Rate Continuation, (c) default by Party in making any Prepayment of a LIBOR Rate Loan after Party has given a notice thereof in accordance with the provisions of this Agreement or (d) the making of a Prepayment of a LIBOR Rate Loan on a day which is not the last day of an Interest Period with respect thereto. Such indemnification may encompass an amount equal to the excess, if any, of (i) the amount of interest which would have accrued on the amount so Prepaid, or borrowed, converted or continued, for the period from the time of such Prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of the failure to borrow, convert or continue, the Interest Period which would have commenced on the date of such failure) in each case the applicable rate of interest for such Loan provided herein over (ii) the amount of interest (as reasonably defined by the Lender) which would have accrued to the Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank LIBOR market. This covenant shall survive the termination of this Agreement and the payment of all Loans and all other Obligations due under this Agreement. Amounts payable pursuant to this subsection shall be paid to Lender upon request. A determination of Lender as to the amounts payable pursuant to this subsection shall be conclusive absent manifest error.

**11.10    Inability to Determine Rates.** If, in connection with any Loan bearing interest at a LIBOR Rate, Lender determines that (a) United States dollar deposits are not being offered to banks in the London interbank market for the applicable amount of such Loan, (b) adequate and reasonable means do not exist for determining the applicable LIBOR Rate, or (c) the applicable LIBOR Rate does not adequately and fairly reflect the cost to Lender of funding that Loan, Lender will promptly so notify the Party. Thereafter, the obligation of Lender to make or maintain any Loan bearing interest at the applicable LIBOR Rate shall be suspended until Lender revokes such notice, and any Loan which would otherwise bear interest at the applicable LIBOR Rate shall accrue interest at that rate, per annum, equal to a rate determined by Lender in Lender's reasonable discretion.

## ARTICLE 12 - MISCELLANEOUS

**12.01    Entire Agreement.** This Agreement and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Party concerning this credit; (ii) replace any prior oral or written agreements between Lender and Party concerning this credit; and (iii) are intended by Lender and Party as the final, complete and exclusive statement of the terms agreed to by them. In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

**12.02    Joint and Several Obligations.** If Borrower consists of more than one Person on a Facility Sheet, each Borrower on such Facility Sheet (a) expressly acknowledges that it has benefited and will benefit, directly and indirectly, from each Loan contained in such Facility Sheet and acknowledges and undertakes, together with the other Borrowers on such Facility Sheet, joint and several liability for the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of such Facility Sheet; (b) acknowledges that this agreement is the independent and several obligation of each Borrower and may be enforced against each Borrower on such Facility Sheet, separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Borrower on such Facility Sheet; and (c) agrees that its liability hereunder and under any other

Loan Document is absolute, unconditional, continuing and irrevocable.  BORROWER EXPRESSLY WAIVES ANY REQUIREMENT THAT LENDER EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER BORROWERS UNDER THIS AGREEMENT, OR ANY OTHER LOAN DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE OBLIGATIONS.

**12.03** **Authority to Bind Party.**  If Party is comprised of multiple Persons, any Person comprising Party is authorized to bind all Parties comprising Party.  Without limitation of the foregoing, Lender may require any Request for Advance or other request, authorization, or other action by or on behalf of Party be by one or more Designated Person.  Lender may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person.

**12.04** **Binding Effect; Successors and Assigns.**  All Loan Documents will inure to the benefit of and be binding upon the Parties and their respective successors and assigns.

**12.05** **Assignment; Participations.**  Party shall not assign its rights or Obligations hereunder without Lender's consent in Lender's sole and absolute discretion.  Lender may assign or sell participations in all or any portion of its interest in any Loan or under any Loan Documents to any Person.  Lender may disclose to any actual or potential assignee or participant any information that Party has delivered to Lender in connection with any Loan Documents; and Party shall cooperate fully with Lender in providing that information.  If Lender assigns or sells a participation in any Loan or any Loan Documents, the purchaser will have a right of set-off against Party.

**12.06** **Severability.**  Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Loan Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Lender may, at its option, declare all Loan Obligations immediately due and payable.

**12.07** **Amendments in Writing.**  The Loan Documents may not be amended, changed, modified, altered or terminated without the prior written consent of all Parties to the respective Loan Document.

**12.08** **Governing Law.** (A) THIS MCA AND ALL LOAN DOCUMENTS HAVE BEEN NEGOTIATED, EXECUTED AND DELIVERED IN VARIOUS JURISDICTIONS.  IN ORDER TO PROVIDE FOR A UNIFORM AND WELL ESTABLISHED BODY OF COMMERCIAL AND OTHER LAW TO DEFINE AND GOVERN THE RIGHTS AND DUTIES OF THE PARTIES, THE PARTIES AGREE THAT THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL SUBSTANTIVE LAWS OF THE GOVERNING LAW STATE WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW RULES THEREOF; PROVIDED, HOWEVER, THAT (I) IF ANY OF THE COLLATERAL SHALL BE LOCATED IN ANY JURISDICTION OTHER THAN GOVERNING LAW STATE, THE LAWS OF SUCH JURISDICTION SHALL GOVERN THE CREATION, PERFECTION AND/OR ENFORCEMENT OF THE LIENS, ASSIGNMENTS AND/OR SECURITY INTERESTS CREATED HEREIN OR IN ANY LOAN DOCUMENT IN CONNECTION HEREWITH AND TO THE ENFORCEMENT OF LENDER'S RIGHTS AND REMEDIES AGAINST THE COLLATERAL, WHICH MATTERS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE COLLATERAL IS LOCATED AND (II) IN THE EVENT THE LAWS OF THE UNITED STATES OF AMERICA AND ANY RULES, REGULATIONS, OR ORDERS ISSUED OR PROMULGATED THEREUNDER APPLICABLE TO THE AFFAIRS AND TRANSACTIONS OF LENDER AND/OR PARTY OTHERWISE PREEMPT GOVERNING LAW STATE LAW, SUCH FEDERAL LAW SHALL CONTROL.  IN PARTICULAR, THE PARTIES HERETO AGREE THAT ALL ISSUES RELATING TO USURY, LIMITATIONS ON INTEREST, LOAN CHARGES AND COMMITMENT FEES PAYABLE UNDER THE OBLIGATIONS AND THE LOAN AGREEMENT SHALL BE GOVERNED BY THE LAWS OF GOVERNING LAW STATE.  TO THE FULLEST EXTENT PERMITTED BY LAW, PARTY HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT AND/OR THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF GOVERNING LAW STATE.  PARTY UNDERSTANDS, AGREES AND ACKNOWLEDGES THAT (A) THIS AGREEMENT AND THE TRANSACTION EVIDENCED HEREBY HAVE SIGNIFICANT AND SUBSTANTIAL CONTACTS WITH THE GOVERNING LAW STATE, (B) IT IS CONVENIENT TO PARTY AND LENDER TO SELECT THE LAW OF THE GOVERNING LAW STATE TO GOVERN THIS AGREEMENT AND THE TRANSACTIONS EVIDENCED HEREBY, (C) THE TRANSACTIONS EVIDENCED BY THIS AGREEMENT BEAR A REASONABLE CONNECTION TO THE LAWS OF THE GOVERNING LAW STATE, (D) THE CHOICE OF THE INTERNAL LAWS OF THE GOVERNING LAW STATE WAS MADE FOR GOOD AND VALID REASONS, AND (E) THE CHOICE OF THE GOVERNING LAW STATE CONSTITUTES GOOD AND VALUABLE CONSIDERATION FOR LENDER TO ENTER INTO THIS AGREEMENT AND LENDER HAS ENTERED INTO THIS AGREEMENT IN RELIANCE ON THIS CHOICE.

**12.09** **Governing Law State.**  The Governing Law State is Iowa.

**12.10** **Jurisdiction and Venue.**  PARTY HEREBY AGREES THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY PARTY AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT SHALL BE LITIGATED IN ANY CIRCUIT COURT OR UNITED STATES DISTRICT COURT OF THE GOVERNING LAW STATE, OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION.  PARTY HEREBY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY OF SUCH COURTS, AND HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREES THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO PARTY AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THIS AGREEMENT.  PARTY WAIVES ANY CLAIM THAT THE GOVERNING LAW STATE IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE.  SHOULD PARTY, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE MAILING THEREOF, PARTY SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY LENDER AGAINST PARTY AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS.  THE EXCLUSIVE CHOICE OF FORUM FOR PARTY SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING BY LENDER OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, AND PARTY HEREBY WAIVES THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION.

**12.11** **Counterpart Execution and Signatures.**  All Loan Documents may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document.  An original signed counterpart f this Agreement in the form of paper with a signature ink transmitted by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes; subject to the obligation, that Borrower

3E Properties/EFP MCA 2018
Master Credit Agreement
v.004.20180515

7

051

shall within twenty (20) days of delivery of the copy, deliver an original signed copy of this Agreement to Lender.  Failure to deliver the original in accordance with this paragraph shall be a Non-Monetary Default After Notice.

**12.12    Necessary Action.**  Lender is authorized to execute any other documents or take any other actions necessary to effectuate any Loan Documents and the consummation of the transactions contemplated therein.

**12.13    Credit Report.** Lender is authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Party.  Without limitation, a copy of the consent for release of information, general authorization or similar document on file with Lender shall authorize third Persons to provide the information requested from time to time.

**12.14    Consent to Disclosure.**  Party agrees and consents to the communication and disclosure of all information in respect of the transaction governed by this Agreement and all matters incidental hereto and thereto by Lender: (i) to the head office and all other branches and Affiliates of Lender, provided such communication and disclosure is for risk management and administrative purposes; and (ii) as required by any Applicable Law or regulation or any court or regulatory or other authority of competent jurisdiction.

**12.15    No Construction Against Drafter.**  Each Party has participated in negotiating and drafting this Agreement, so if an ambiguity or a question of intent or interpretation arises, this Agreement is to be construed as if the Parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this Agreement.

**12.16    Indemnification.**  PARTY SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS: (I) INCURRED AS A RESULT OF THE FAILURE BY PARTY TO BORROW THE AMOUNT SPECIFIED IN A LOAN REQUEST (INCLUDING ANY FAILURE RESULTING FROM THE FAILURE TO FULFILL THE APPLICABLE CONDITIONS PRECEDENT), INCLUDING ANY LOSS OF ANTICIPATED PROFITS AND LOSSES BY REASON OF THE LIQUIDATION OR REEMPLOYMENT OF FUNDS ACQUIRED BY LENDER TO FUND THE LOAN; (II) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY PARTY OR ANY DESIGNATED PERSON, WHICH ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS; (III) ARISING OUT OF OR RESULTING FROM THE VIOLATION BY PARTY OF ANY ENVIRONMENTAL LAW; (IV) RESULTING FROM THE RELIANCE BY LENDER ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF PARTY; (V) INCURRED BY LENDER UNDER ANY GUARANTY, INDEMNITY OR THE LIKE GIVEN TO RABOBANK, N.A., WITH RESPECT TO INDEMNIFIED RNA LIABILITIES; AND (VI) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF LENDER BEING PARTY TO THIS AGREEMENT OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS AGREEMENT; THIS INDEMNIFICATION SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO MATTERS WHICH, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE (WHETHER SOLE, COMPARATIVE, OR CONTRIBUTORY) OR STRICT LIABILITY OF SUCH (AND/OR ANY OTHER) INDEMNIFIED PERSON, EXCEPT THAT PARTY SHALL HAVE NO OBLIGATION TO AN INDEMNIFIED PERSON UNDER THIS SECTION WITH RESPECT TO LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT INDEMNIFIED PERSON AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT ANY INDEMNITY UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES IS UNENFORCEABLE FOR ANY REASON, PARTY SHALL MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF WHICH IS PERMISSIBLE UNDER APPLICABLE LAW.  ALL INDEMNITIES UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

**12.17    Collateral Agency Agreement.**  Parties hereby acknowledge Lender has entered in to the Collateral Agency Agreement which, as amended, modified, or restated, permits Rabo AgriFinance LLC to act as a Collateral Agent in serving the applicable Loan.

**12.18    Waiver of Trial By Jury.**  THE PARTIES (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS AGREEMENT; OR (II) ANY COLLATERAL DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE; AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY AND ARE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO. THE COLLATERAL DOCUMENTS AND THE SWAP COUNTERPARTIES ENTERING INTO THE HEDGING AGREEMENTS.

**12.19    Office of Foreign Assets Control; Patriot Act.**  Without limiting the provisions of any other provision hereof above, each Party shall, and each Party shall cause each of its Subsidiaries and Affiliates to, (1) ensure that no Person who owns a controlling interest in or otherwise controls such Person shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the OFAC, the Department of the Treasury or included in any executive orders, (2) not use or permit the use of the proceeds of any Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or executive order relating thereto, (3) comply with the Bank Secrecy Act  and its implementing laws and regulations, as amended, including without limitation those related to anti-money laundering; and (4) ensure that it is and each of its Subsidiaries and Affiliates are not engaged in illegal activity or are a  recipient of proceeds of illegal activity,.  As required by federal law and each Lender's policies and practices, each Lender may need to obtain, verify and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services.

The Parties have signed this Agreement effective as of the day and year first written above and certify Parties have received and agree to the provisions set forth in the Schedule of Definitions as acknowledged and incorporated above.

**PARTY:**

**EASTERDAY FARMS PRODUCE, CO.,** a Washington corporation

Address for Notices:
1427 N 1st Ave
Pasco, WA 99301

By: _____
JODY DEE EASTERDAY
President

Alternate address for notice by U.S. Mail:
PO Box 2813
Pasco, WA 99302

**3E PROPERTIES,** a Washington general partnership

Address for Notices:
1427 N 1st Ave
Pasco, WA 99301

By: _____
JODY DEE EASTERDAY
Partner

Alternate address for notice by U.S. Mail:
PO Box 2813
Pasco, WA 99302

By: _____
CODY ALLEN EASTERDAY
Partner

By: _____
DEBBY EASTERDAY
Partner

By: _____
GALE ALLEN EASTERDAY
Partner

By: _____
KAREN LOUISE EASTERDAY
Partner

Address for Notices:
631 Bellflower Road
Mesa, WA 99343

_____
GALE ALLEN EASTERDAY

Address for Notices:
631 Bellflower Road
Mesa, WA 99343

_____
KAREN LOUISE EASTERDAY

Address for Notices:
830 Bellflower Road
Mesa, WA 99343

_____
CODY ALLEN EASTERDAY

Address for Notices:
830 Bellflower Road
Mesa, WA 99343

_____
DEBBY EASTERDAY

Address for Notices:
7915 W. Dradie St.
Pasco, WA 99301

_____
JODY DEE EASTERDAY

3E Properties/EFP MCA 2018
Master Credit Agreement
v.004.20180515

9

053

Address for Notices:
7915 W. Dradie St.
Pasco, WA 99301

_____

**ANDREW H WILLS**

**LENDER:**

**RABO AGRIFINANCE LLC**

Address for Notices:

14767 N. Outer 40 Rd., Suite 400
Chesterfield, MO 63017
Attention: Loan Closing Department

By: _____

    Name: _____

    Title: _____

3E Properties/EFP MCA 2018
Master Credit Agreement
v.004.20180515

055

**Exhibit A**

**SCHEDULE OF DEFINITIONS AND COVENANTS**

As further acknowledged in Section 2.01 of the Master Credit Agreement, Party has received the Schedule of Definitions via paper copy, electronic copy, electronic mail or by accessing the Schedule of Definitions with the version number that matches the version number shown in the footer of this Agreement at https://www.raboag.com/about-us/scheduledefinitions-167.

**EXHIBIT B**

**APPLICABLE OBLIGOR COVENANTS SCHEDULE**

**Covenants**

Until such time as all Obligations have been paid in full:

1.01    **Financial Covenants.**

(a)    **Debt Service Coverage Ratio.**  Easterday Farms Produce, 3E Properties, Easterday Farms, and Easterday Ranches shall maintain a Consolidated Debt Service Coverage Ratio of not less than 1.25:1.00, determined as of the end of each fiscal year.

2.01    **Reporting Requirements.**

(a)    as soon as available, but no later than 150 days after the end of each fiscal year, a copy of CPA Compiled Consolidated financial statements of Easterday Farms Produce and 3E Properties for that period;

(b)    as soon as available, but no later than 150 days after the end of each fiscal year, a copy of CPA Reviewed Consolidated financial statements of Easterday Farms Produce, 3E Properties, Easterday Farms, and Easterday Ranches for that period, along with a Compliance Certificate as of the end of that period;

(c)    as soon as available, but no later than 45 days after filing, copies of federal income tax returns filed by Easterday Farms Produce, 3E Properties, Easterday Farms, and Easterday Ranches, including all schedules and exhibits and any extensions of the filing date;

(d)    no later than 150 days after the end of each fiscal year, an updated budget of projected income and expenses relating to Easterday Farms Produce's operations for the upcoming fiscal year;

**Exhibit A**

**SCHEDULE OF DEFINITIONS AND COVENANTS**

As further acknowledged in Section 2.01 of the Master Credit Agreement, Party has received the Schedule of Definitions via paper copy, electronic copy, electronic mail or by accessing the Schedule of Definitions with the version number that matches the version shown in the footer of this Agreement at https://www.raboag.com/about-us/scheduledefinitions-167.

The following terms shall have the following meanings in the Loan Documents:

**ARTICLE 1 - Definitions**

**1.01** **Accordion Increase** means an uncommitted increase in the maximum principal amount of the Line of Credit more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

**1.02** **Accounts Receivable** means accounts which: (A) arise from the sale of goods or the providing of services by Borrower, which comply with the account debtor's specifications (if any) and have been provided or delivered to, and have been accepted by, account debtor, (B) arise in the ordinary course of Borrower's business, (C) are evidenced by an invoice rendered to account debtor dated not earlier than the date of the provision of services or the date of shipment or delivery of goods, as applicable, (D) have payment terms acceptable to Lender, (E) are not evidenced by a note, chattel paper or other instrument, (F) are not payable on an installment basis, (G) are valid, legally enforceable and unconditional obligations of account debtor, and not subject to any setoff, counterclaim, or credit, allowance or adjustment by account debtor, or to any claim by account debtor denying liability thereunder in whole or in part (to the extent of the amount of such setoff or counterclaim) or are restructured, extended or modified, (H) do not arise out of a contract which, by its terms, forbids, restricts or makes void or unenforceable the assignment by Borrower to Lender of the account arising with respect thereto, (I) are owing by an account debtor which (1) is not an Affiliate of Borrower, (2) is a resident or citizen of, and is located within, the United States of America, and (3) is not the subject of an Insolvency Proceeding, (J) are not accounts arising from a "sale on approval", "sale or return" or "consignment", or subject to any other repurchase or return agreement, (K) are not accounts with respect to which possession and/or control of the goods sold giving rise thereto is held, maintained or retained by Borrower (or by any agent or custodian of Borrower), (L) comply with all warranties, representations and covenants in the Loan Documents relating thereto, (M) if account debtor is the United States of America or any state or local governmental entity, or any department, agency or instrumentality thereof, Borrower has assigned its rights to payment of such Accounts to Lender, pursuant to the Assignment of Claims Act of 1940, as amended, or pursuant to any similar state or local law, regulation or requirement, or as otherwise acceptable to Lender and (N) are not owing by an account debtor with respect to which 20% or more of the aggregate accounts owing by such account debtor to Borrower are ineligible Accounts Receivable for any reason; provided, that Lender may, consistent with Lender's normal credit practices, from time to time upon 30 days prior written notice to Borrower, designate categories of ineligible accounts in addition to those above; provided, also, that such designation shall be immediately effective upon the occurrence of an Event of Default or if an Event of Default is in existence at the time of such designation.

**1.03** **ACH** means Automated Clearing House, an electronic funds-transfer system run by the National Automated Clearing House Association.

**1.04** **ACH Payments** means Lender's initiation of debits to the Designated Account, on the due date, for all interest and principal payments, any fees and expenses, and any other amounts due and payable by Borrower with respect to the applicable Loan, by means of the automatic clearinghouse electronic funds transfer system, or by any other commercially accepted method.

**1.05** **Adjust** means to increase or decrease.

**1.06** **Adjusted** means increased or decreased.

**1.07** **Adjustment** means an increase or decrease.

**1.08** **Adjustment Date** means each date on which the rate of interest is or may be Adjusted by Lender pursuant to a Facility Sheet.

**1.09** **Advance Period** means the period of time that Lender is extending credit from time to time to the Borrower from the Closing Date to the Maturity Date (that period, including extensions, if any) more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

**1.10** **Affiliate** means of a Person other than an individual, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

**1.11** **Amortization Period** means the period of time commencing on the date the applicable Loan is made over which equal period payments of the applicable Loan would result in the reduction of the outstanding principal balance of the applicable Loan being reduced to zero.

**1.12** **Amount** means the aggregate unpaid principal balance of the applicable Loan.

**1.13** **Annual Anniversary Date** means, with respect to each Loan, the annual anniversary date set forth in the MCA or any amendment, modification or supplement thereto for such Loan, or any other earlier date when, under the terms of the MCA, the entire unpaid principal amount of such Loan is due.

**1.14** **Applicable Law** means all existing and future laws, orders, ordinances, rules and regulations of or by a Governmental Authority; except that in determining the Maximum Rate, Applicable Law shall mean those laws, orders, ordinances, rules and regulations in effect as of the date hereof or if there is a change in Applicable Law which (a) permits Lender to charge interest on amounts which Lender would not otherwise be permitted to charge interest, or (b) increases the permissible rate of interest, then the new Applicable Law as of its effective date.

**1.15**    <u>Applicable Obligor Covenants Schedule</u> means the Applicable Obligor Covenant Schedule, as may from time to time be amended, modified, replaced or supplemented in Lender's sole discretion and as attached to the MCA as <u>Exhibit B</u>.

**1.16**    <u>Appraisal</u> means a third party valuation of Real Estate performed by an appraiser with significant experience in rural appraisal principles, practices and valuations who is (i) state licensed or certified in at least one state, (ii) a member of the American Society of Farm Managers and Rural Appraisers (ARA), or (iii) a member of the Appraisal Institute (MAI).

**1.17**    <u>Appraisal Expenses</u> means Lender's out of pocket expenses incurred in connection with obtaining any Appraisal of the Collateral.

**1.18**    <u>Appraisal Value</u> means the value of Collateral as determined by an Appraisal in form and content satisfactory to Lender and subject to Lender's review and Adjustment as deemed appropriate by Lender.

**1.19**    <u>Bank Secrecy Act</u> means the Bank Secrecy Act, 31 U.S.C. Section 5311, *et seq.*

**1.20**    <u>Bankruptcy Code</u> means Title 11 of the United States Code.

**1.21**    <u>Base Rate</u> means with respect to each applicable Loan Type, the greater of (i) the Prime Rate plus the Interest Rate Margin per annum, Adjusted daily, or (ii) the Floor Rate per annum. The Base Rate is Adjusted daily.

**1.22**    <u>Base Rate Loan</u> means a Loan which bears interest at a Base Rate.

**1.23**    <u>Book Overdraft/Outstanding Pending Transactions</u> means uncashed checks and other outstanding debits to the Borrower's demand deposit accounts and other outstanding obligations of Borrower determined by Lender.

**1.24**    <u>Borrower</u> shall be a Party that is designated in a Facility Sheet from time to time as a Borrower.

**1.25**    <u>Borrower Representations</u> means all representations made by Borrower to Lender under the MCA.

**1.26**    <u>Borrower's Funds Account</u> means an interest-bearing escrow account.

**1.27**    <u>Borrowing Base</u> means, with respect to each applicable Loan Type, the meaning given unto such term in the MCA or any amendment, modification or supplement thereto.

**1.28**    <u>Borrowing Base Certificate</u> means a certificate in a form required by Lender, properly completed and certified by Borrower, for purposes of calculating the Borrowing Base for each applicable Loan, together with all supporting documentation required by Lender.

**1.29**    <u>Budget</u> means with respect to each applicable Loan Type, the applicable budget included in the applicable Facility Sheet, including anticipated costs of Borrower that was approved by Lender in connection with each Loan Type.

**1.30**    <u>Building Loan Agreement</u> means any building loan agreement between Borrower and Lender, if any.

**1.31**    <u>Business Day</u> means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the Applicable Laws of the State of Iowa or Missouri, or are in fact closed in the State of Iowa or Missouri.

**1.32**    <u>Capital Expenditures</u> means expenditures for fixed or capital assets.

**1.33**    <u>Cash Forward Cattle Contract</u> means a contract for the future sale of cattle ("live cattle", "feeder cattle" or otherwise, as acceptable to Lender) which has been entered into and is enforceable by the owner and buyer of such cattle at a cash price that is fixed on the date when the contract is entered.

**1.34**    <u>Cash Forward Hog Contract</u> means a contract for the future sale of hogs ("isowean pigs", "feeder hogs", "lean hogs", "live hogs" or otherwise, as acceptable to Lender) which has been entered into and is enforceable by the owner and buyer of such hogs at a cash price that is fixed on the date when the contract is entered and is otherwise acceptable to Lender.

**1.35**    <u>Cattle</u> means any cattle more particularly described in the MCA or any amendment, modification or supplement thereto with respect to any Loan Type.

**1.36**    <u>Cattle Deposits Received</u> means deposits received by Borrower from a feedyard or other buyer relating to certain cattle contracts for the sale of cattle by Borrower at certain agreed upon terms, determined by Lender.

**1.37**    <u>Cattle Finishing Costs</u> means the aggregate of all costs and expenses for Feed, medicine, shelter and all other items of cost or expense which are customarily or otherwise expected to be incurred to bring cattle to a weight at which they are to be sold for slaughter.

**1.38**    <u>Cattle Futures Contract</u> means a contract for the future sale of cattle ("live cattle", "feeder cattle" or otherwise, as acceptable to Lender) which has been entered into or could have been entered into by the owner and buyer of such cattle through the Chicago Board of Trade, the Chicago Mercantile Exchange, the Kansas City Board of Trade or any other United States contract market subject to the jurisdiction of the Commodity Futures Trading Commission, acceptable to Lender.

**1.39**    **Cattle Marketing Costs** means reasonable expenses to be incurred in the sale of the cattle at the point for delivery under a Cattle Futures Contract.

**1.40**    **Closing** means (a) the acknowledgement by Lender that all conditions precedent to the applicable Loan are satisfied or waived in accordance with the MCA, or (b) the applicable Loan is made, whichever is earlier.

**1.41**    **Closing Date** means the date of the Closing of the applicable Loan as set forth in the MCA or any amendment, modification or supplement thereto for such Loan.

**1.42**    **Closing Expenses** means Lender's out of pocket expenses, including Legal Fees and any fees and costs payable by Lender as set forth in the MCA or any amendment, modification or supplement thereto, incurred in connection with the underwriting of the applicable Loan or the Closing.

**1.43**    **Co-Maturity Provision** means that under the MCA, all unpaid Loan Obligations with respect to any Loan shall be paid on the earlier of the date when any Loan Obligations with respect to any other Loan are due or are Prepaid in full.

**1.44**    **Collateral** means any and all of the (i) real property of the Borrower pursuant to which Liens in favor of Lender and/or Collateral Agent are granted or intended to be granted pursuant to the Collateral Documents, (ii) personal property of the Borrower, of every kind and character, including all accounts, contracts, contract rights, Permits, general intangibles, payment intangibles, investment property, chattel paper, furniture, fixtures, equipment, watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, frost protection apparatus, windmills, fences, fittings, appliances, inventory, instruments, inventory, farm products, including crops grown, growing or to be grown, livestock in their unmanufactured state, timber standing or to be cut, minerals or the like (including oil and gas), raw materials, intellectual property, proceeds of any crop insurance, price support payment or other government program, books and records including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory, and any hedging obligations, whether now owned and existing or hereafter acquired or arising, wherever located, together with all accessions thereto, substitutions and replacements therefor, and all proceeds thereof, pursuant to which Liens in favor of Lender and/or Collateral Agent are granted or intended to be granted pursuant to the Collateral Documents, and (iii) all other items and property pursuant to which Liens in favor of Lender and/or Collateral Agent are granted or intended to be granted pursuant to the Collateral Documents.

**1.45**    **Collateral Agency Agreement** means the internal collateral agency agreement between Rabo AgriFinance LLC, formerly known as Rabo Agrifinance, Inc., Rabobank, and RNA governing their rights and Obligations permitting Rabo AgriFinance LLC to act as a Collateral Agent in servicing the applicable Loan.

**1.46**    **Collateral Agent** means Rabo AgriFinance LLC.

**1.47**    **Collateral Assignment** means any assignment of personal property such as grazing leases, farm product purchase contracts, intellectual property, water stock, certificates and rights, membership interests, corporate stock, livestock or the like now or hereafter entered into by Borrower in favor of Collateral Agent and encumbering all or any portion of the Collateral described therein.

**1.48**    **Collateral Documents** means any Security Instrument, Guaranty, and any other instruments and agreements securing all or any of the Obligations.

**1.49**    **Committed Amount** means the principal face amount of the Note more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

**1.50**    **Commodity Hedge Account** means any commodity hedging or other agreement enabling a Person to limit the market risk of holding a commodity in either the cash or futures market.

**1.51**    **Compensation** means, as applicable, salaries and other compensation paid to shareholders, members, partners, directors, managers, and officers.

**1.52**    **Compliance Certificate** means a certificate setting forth (i) the information and computations (in sufficient detail) to establish compliance with all Borrower Covenants (ii) whether there exists an Event of Default or event which with the passage of time or the giving of Notice would be an Event of Default and, if any such Event of Default or other event exists, specifying the nature thereof and the action being taken or proposed to be taken with respect to that Event of Default or other event.

**1.53**    **Condemnation Award** means all awards made for the taking by condemnation or the power of eminent domain, or any proceeding or purchase in lieu thereof, of the whole or any part of the Real Estate.

**1.54**    **Consent and Waivers by Non-Borrower Pledgor** means Lender is authorized to perform any of the following acts at any time, all without Notice to Non-Borrower and without affecting the rights of Lender or Non-Borrower's Obligations under the Loan Documents:  (i) alter any terms of the MCA or any part of it, including renewing, compromising, extending or accelerating, or otherwise changing the time for payment of, or increasing or decreasing the rate of interest on, the Obligations; (ii) take and hold security for the Obligations, accept additional or substituted Collateral for the Obligations, and subordinate, exchange, enforce, waive, release, compromise, fail to perfect, sell or otherwise dispose of any such Collateral; (iii) apply any Collateral now or later held for the Obligations in any order that Lender may choose, and direct the order and manner of any sale of all or any part of it and bid at any such sale; (iv) release Borrower of its liability for the Obligations or any of them; (v) substitute, add or release any one or more guarantors or endorsers of the Obligations; and (vi) extend other credit to Borrower, and take and hold security for the credit so extended, whether or not such security also secures the Obligations. Furthermore, Non-Borrower waives:  (i) any right to require Lender to proceed against Borrower, proceed against or exhaust any Collateral held from Borrower, or pursue any other remedy in Lender's power to pursue; (ii) any defense based on any legal disability of Borrower, any discharge or limitation of the liability of Borrower to Lender, whether consensual or arising by operation of law or any bankruptcy, reorganization, receivership, insolvency, or debtor-relief proceeding, or from any other cause, or any claim that Non-Borrower's Obligations exceed or are more burdensome than those of Borrower; (iii) all presentments, demands for performance, Notices of nonperformance, protests, Notices of protest, Notices of

dishonor, Notices of acceptance of the Loan Documents and of the existence, creation, or incurring of new or additional indebtedness of Borrower, and demands and Notices of every kind; (iv) any defense based on or arising out of any defense that Borrower may have to the payment or performance of the Obligations or any of them; and (v) until the Obligations have been paid and performed in full, all rights of subrogation, reimbursement, indemnification and contribution (contractual, statutory or otherwise), including any claim or right of subrogation under the Bankruptcy Code or any successor statute, all rights to enforce any remedy that Lender may have against Borrower, and all rights to participate in any Collateral now or later to be held by Lender for the Obligations. Non-Borrower waives all rights and defenses that Non-Borrower may have because the Obligations may be secured by any particular Collateral. This means, among other things: (i) Lender may enforce the Loan Documents against Non-Borrower without first foreclosing on any other real or personal property Collateral securing the Obligations; and (ii) if Lender forecloses on any particular Collateral securing the Obligations: (A) the amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the Collateral is worth more than the sale price, and (B) Lender may enforce the Loan Documents against Non-Borrower even if Lender, by foreclosing on any Collateral, has destroyed any right Non-Borrower may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Non-Borrower may have because the Obligations may be secured by any particular Collateral. Non-Borrower waives any right or defense it may have at law or equity, to a fair market value hearing or action to determine a deficiency Judgment after a foreclosure of any Collateral granted to Lender under the Loan Documents. Non-Borrower assumes full responsibility for keeping informed of Borrower's financial condition and business operations and all other circumstances affecting Borrower's ability to pay and perform its Obligations to Lender, and agrees that Lender will have no duty to disclose to Non-Borrower any information which Lender may receive about Borrower's financial condition, business operations, or any other circumstances bearing on its ability to perform. No provision or waiver in the Loan Documents shall be construed as limiting the generality of any other provision or waiver contained in this consent. Non-Borrower certifies that as of the date hereof and after giving effect to the advance contemplated by the applicable Loan and Security Instrument to which the Consent and Waiver by Non-Borrower pledgor applies, Non-Borrower will be solvent. Non-Borrower represents that it has determined that the terms available to the maker of the Note are in Non-Borrower's best interests. Non-Borrower acknowledges that it will derive substantial direct and indirect benefit from the transactions contemplated by the Note. Non-Borrower has determined that its execution, delivery and performance of the Security Instrument to which the Consent and Waiver by Non-Borrower pledgor applies, directly benefits, and is within the corporate purposes and in the best interests of the Non-Borrower. Non-Borrower certifies that as of the date hereof Non-Borrower is not engaged in business or a transaction, or about to engage in business or a transaction for which any property remaining with Non-Borrower will result in an unreasonably small amount of capital.

1.55    **Consolidated** means, in connection with any definition, financial report or financial covenant, the combination of the applicable Persons, together with their Subsidiaries.

1.56    **Construction Line of Credit** means any credit Lender shall extend from time to time to Borrower in accordance with the MCA or any amendment, modification, or supplement thereto.

1.57    **Contractor** means, collectively, all contractors providing labor or materials for the completion of the Project under a direct contract with Borrower.

1.58    **Control** of a Person other than an individual means the power to direct the management and policies of that Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

1.59    **Conversion** means the conversion of any applicable Construction Line of Credit, Development Line of Credit, or Equipment Line of Credit Loan into a Term Loan provided all terms and conditions in the MCA are satisfied.

1.60    **Conversion Conditions** shall have the same meaning given unto such term in the MCA or any amendment, modification or supplement thereto.

1.61    **Conversion Date** means the date Lender acknowledges that all conditions precedent to the Conversion are satisfied or waived, more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

1.62    **Conversion Deadline** means the date by which an applicable Construction Line of Credit, Development Line of Credit, or Equipment Line of Credit may be converted to a Term Loan as set forth in the MCA or any amendment, modification or supplement thereto.

1.63    **Conversion Maturity Date** means the Maturity Date of the Conversion.

1.64    **Covenants** means all covenants made by Borrower under the MCA, which shall be in effect until such time as all Obligations have been paid in full and Lender has no obligation to make any advance on the applicable Loan.

1.65    **CPA** means an individual that has been designated Certified Public Accountant by the American Institute of Certified Public Accountants.

1.66    **CPA Audited** means audited by a CPA, including an auditor's opinion.

1.67    **CPA Compiled** means compiled by a CPA, including a compilation report.

1.68    **CPA Reviewed** means reviewed by a CPA, including a review report.

1.69    **Credit Agreement** means the MCA as may be amended, modified or supplemented from time to time.

1.70    **Cross Collateralized Loan Documents** means any and all loan, Mortgage, Security Agreement and guaranty documents entered into between Borrower, and/or any Affiliates of Borrower, and Lender and/or Collateral Agent that are Cross Collateralized with any Loan made hereunder for the purposes of securing the Loan Obligations.

**1.71** **Cross Collateralized** means the Total Property shall secure to Lender the payment of the Cross Collateralized Notes and the performance of the covenants and agreements set forth in the Cross Collateralized Security Instruments and any of the other documents and instruments relating to the applicable Loan, all of which are secured to Lender without apportionment or allocation of any part or portion of the Collateral and without apportionment or allocation of any part or portion of the Total Property. In addition to the rights and remedies provided to Lender elsewhere in the MCA or the Cross Collateralized Loan Documents, upon the breach of any covenant or agreement in any Cross Collateralized Loan Document, Lender shall be allowed to enforce the payment and to exercise all of the rights, remedies and powers provided under any of the Cross Collateralized Loan Documents, or under any provision of law, in one or more proceedings, whether contemporaneous, consecutive or both, to be determined by Lender in its sole and absolute discretion. Lender may enforce its rights against any one or more portions, parts or parcels of the Total Property in such order and manner as Lender may elect in its sole and absolute discretion. The enforcement of the Cross Collateralized Loan Documents against any one or more portion, part or parcel of the Total Property, whether by court action, power of sale or otherwise, shall not constitute an election of remedies, and shall not prejudice or in any way limit or preclude the enforcement of any Cross Collateralized Loan Document through one or more additional proceedings. No Judgment obtained by Lender in any one or more enforcement proceedings shall merge the secured debt into such Judgment, and all of such debt which shall remain unpaid shall be a continuing Obligation of Borrower, not merged into any such Judgment. The Cross Collateralized Security Instruments shall secure to Lender the repayment of any amount which Borrower may owe to Lender pursuant to the Cross Collateralized Notes, including without limitation the amount of any Judgment, together with any interest thereon, which may be rendered in connection with the enforcement of any of the Cross Collateralized Loan Documents. Borrower waives and relinquishes any and all rights it may have, whether at law or equity, to require Lender to proceed to enforce or exercise any rights, powers or remedies Lender may have under any particular Cross Collateralized Loan Document in any particular manner or order or in any particular state or county. Lender may bring any action or proceeding, including without limitation foreclosure through judicial proceedings or by power of sale in state or federal courts, and such proceeding may relate to all or any part of the Total Property without regard to the fact that any one or more prior or contemporaneous proceeding has been commenced elsewhere with respect to the same or any other part of the Total Property. In the event of the enforcement or foreclosure of any Cross Collateralized Security Instrument whether by way of judicial proceedings or nonjudicial proceedings, the proceeds of such enforcement or foreclosure shall be applied to the repayment of any of the Cross Collateralized Loan Documents in any order as Lender may decide in Lender's sole discretion. Any release of any Cross Collateralized Security Instrument with respect to any one portion, part or parcel of the Total Property shall not in any event prevent or impair Lender from enforcing all of its rights and remedies with respect to any portion, part or other parcel of the Total Property. Borrower and any party who now has or may in the future have a security or other interest in any of the Total Property waives any and all right to require the marshaling of assets or to require that any of the Total Property be sold in the inverse order of alienation, or that any of the Total Property be sold in parcels, or as an entirety, or in any combination, in connection with the exercise of any of the remedies permitted by Applicable Law, or any of the Loan Documents.

**1.72** **Cross Collateralized Notes** means a Note that is Cross Collateralized.

**1.73** **Cross Collateralized Security Instruments** means a Security Instrument which is Cross Collateralized.

**1.74** **Current Ratio** means the ratio of current assets to current liabilities.

**1.75** **Dairy Cattle** means milk cows, dry cows, breeding bulls, heifers, calves and other dairy cattle.

(a) **Dairy Current Ratio** means the ratio of current assets (including Dairy Cattle) to current liabilities, plus any Funded Debt related to Dairy Cattle.

(b) **Dairy Debt Service Coverage Ratio** means the ratio of Stabilized EBITDA (net of Herd Maintenance Expenses) minus Compensation (to the extent, if any, not treated as an expense for purposes of calculating EBITDA), minus Distributions, and minus cash income taxes to the current portion of Funded Debt plus interest expense, plus capital lease payments.

(c) **Dairy Working Capital** means (a) current assets (including Dairy Cattle) minus (b) current liabilities plus any Funded Debt related to Dairy Cattle.

**1.76** **Debt Service Coverage Ratio** means the ratio of Stabilized EBITDA minus Compensation (to the extent, if any, not treated as an expense for purposes of calculating EBITDA), minus Distributions, and minus cash income taxes to the current portion of Funded Debt plus interest expense, plus capital lease payments.

**1.77** **Debt to Tangible Net Worth** means the ratio of total liabilities to Tangible Net Worth.

**1.78** **Debt to Total Assets Ratio** means total liabilities divided by total assets converted to an equivalent percentage.

**1.79** **Default Rate** means the rate applicable to the unpaid principal balance of the Loans plus 10.000% per annum. Interest payable at the Default Rate shall be paid from time to time on demand, or if not sooner demanded, on the first day of each month. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

**1.80** **Designated Account** means a demand deposit account with RNA or another bank approved by Lender in good standing, that Borrower is required to maintain, upon the request of Lender, so long as Lender has any obligation to make any advance of Loan funds or any Loan Obligations or any Loan remains unpaid or unsatisfied.

**1.81** **Designated Person** means one or more individuals designated to Lender in writing by the parties comprising Borrower.

**1.82** **Development Line of Credit** means any credit Lender shall extend from time to time to Borrower in accordance with the MCA or any amendment, modification or supplement thereto.

**1.83** <u>Distributions</u> means, as applicable, living expenses for individuals, or dividends, distributions or other payments (whether in cash, securities or other property) with respect to any capital stock, membership interest, general or limited partnership interest, beneficial interest in a trust or other equity interest.

**1.84** <u>Drafting Conventions</u> means the following described conventions which the Loan Documents shall be interpreted in accordance with, unless expressly stated therein or the context otherwise requires: (a) the words "include," "includes," and "including" are to be read as if they were followed by the phrase "without limitation"; (b) unless otherwise expressly stated, terms and provisions applicable to two or more Persons shall apply on an individual, as well as collective basis; (c) headings and captions are provided for convenience only and do not affect the meaning of the text which follows; (d) references to a parcel or tract of real estate means, without limitation, the land described, and any and all improvements located thereupon and all easements or other rights or interests benefiting that land; (e) references to an agreement or instrument means that agreement or instrument, together with all extensions, renewals, modifications, substitutions and amendments thereof, subject to any restrictions thereon in that agreement or instrument or in the Loan Documents; (f) ANY REPORT OR DOCUMENT TO BE RECEIVED BY LENDER SHALL BE SATISFACTORY IN FORM AND CONTENT TO LENDER; (g) WHEREVER (I) LENDER EXERCISES ANY RIGHT GIVEN TO IT TO APPROVE OR DISAPPROVE, (II) ANY ARRANGEMENT OR TERM IS TO BE SATISFACTORY TO LENDER, OR (III) ANY OTHER DECISION OR DETERMINATION IS TO BE MADE BY LENDER, THEN EXCEPT AS MAY BE OTHERWISE EXPRESSLY AND SPECIFICALLY PROVIDED THEREIN, THE DECISION TO APPROVE OR DISAPPROVE, ALL DECISIONS THAT ARRANGEMENTS OR TERMS ARE SATISFACTORY OR NOT SATISFACTORY, AND ALL OTHER DECISIONS AND DETERMINATIONS MADE BY LENDER, SHALL BE IN THE SOLE DISCRETION OF LENDER, WITHOUT REGARD FOR THE ADEQUACY OF ANY SECURITY FOR THE OBLIGATIONS; (h) whenever by the terms of the Loan Documents, Borrower is prohibited from taking an action or permitting the occurrence of some circumstance, Borrower shall not, directly or indirectly take that action or permit that circumstance, or directly or indirectly permit any Subsidiary to take that action or permit that circumstance; (i) evidence of the occurrence or non-occurrence of any event, or the existence or non-existence of any circumstance to be delivered to Lender must be in a form satisfactory to Lender; (j) unless specified otherwise, references to a statute or regulation means that statute or regulation as amended, modified or supplemented from time to time and any corresponding provisions of successor statutes or regulations; (k) unless otherwise specified, all references to a time of day are references to the time in St. Louis, Missouri; (l) references to "month" or "year" are references to a calendar month or calendar year, respectively; (m) if any date specified in the MCA as a date for taking action falls on a day that is not a Business Day, then that action may be taken on the next Business Day; (n) a pronoun used in referring generally to any member of a class of Persons, or Persons and things, applies to each member of that class, whether of the masculine, feminine, or neuter gender; (o) references to "articles," "sections," "subsections," "paragraphs," "exhibits," and "schedules" reference articles, sections, subsections, paragraphs, exhibits, and schedules, respectively, of the MCA unless otherwise specifically provided; (p) the words "hereof," "herein," "hereunder," and "hereby" refer to the MCA as a whole and not to any particular provision of the MCA; (q) the definitions in the Schedule of Definitions and Covenants, MCA and the Loan Documents apply equally to both singular and plural forms of the terms defined; and (r) for purposes of computing periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".

**1.85** <u>Drawdown Date</u> means in the case of the applicable Loan, the date on which that Loan is made, in the case of a Rate Conversion, the effective date of the Rate Conversion, and in the case of a LIBOR Rate Continuation, the effective date of the LIBOR Rate Continuation.

**1.86** <u>EBITDA</u> means at any date (a) net income, excluding any extraordinary and non-operating income (unless deemed by Lender to be recurring in nature), of a Person for the preceding twelve months plus (b) any interest expense, income taxes, depreciation, amortization, and other non-cash charges for that twelve months to the extent they were deducted from gross income to calculate net income.

**1.87** <u>Election to Prepay</u> means Borrower's notification to Lender, which notification may be given at any time prior to the Adjustment Date, of its election to Prepay the principal indebtedness accruing interest at the Long Term Adjustable Rate.

**1.88** <u>Eligible Accounts Receivable</u> means (as may be further limited by specific defined terms) Accounts Receivable which are (A) owned by Borrower, (B) subject to a first priority perfected security interest in favor of Lender, (C) not subject to any Lien in favor of a Person other than Lender (D) otherwise acceptable to Lender; excluding any portion constituting advertising, finance charges, services charges, or sales or excise taxes.

**1.89** <u>Eligible Breeding Stock</u> means gilts, sows, boars, or other such breeding stock acceptable to Lender which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

**1.90** <u>Eligible Cattle</u> means calves, heifers, steers, cows, bulls and other cattle acceptable to Lender which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

**1.91** <u>Eligible Cattle Down Payments</u> means down payments paid by Borrower for cattle purchased from sellers of cattle and to be delivered to the Borrower at an agreed upon date in the future, all as acceptable to Lender.

**1.92** <u>Eligible Cattle Value</u> means the market value determined by (A) multiplying (1) the price per hundredweight at which a Cattle Futures Contract (for delivery and cash settlement of live cattle on a delivery date nearest to the estimated date on which such cattle will be finished, or for delivery and cash settlement of feeder cattle on a delivery date nearest to the estimated date on which such cattle will meet feeder cattle contract specifications) could be entered into by the Borrower with respect to Eligible Cattle on the date the Eligible Cattle Value is determined, or (2) the price per hundredweight of a Cash Forward Cattle Contract with respect to Eligible Cattle between Borrower and a reputable counterparty acceptable to lender, plus or minus the local basis (e.g., plus or minus the 5 year average Texas Panhandle Live Cattle Basis provided by the Texas Cattle Feeders Association) and any premiums or discounts, times (2) the number of hundredweights projected to be deliverable when such cattle are finished, then (B) subtracting the sum of (1) Cattle Finishing Costs projected to be incurred, on the basis of existing market conditions, plus (2) Cattle Marketing Costs; provided, however, if there is no Cattle Futures Contract or Cash Forward Contract for reference, then the market value will be determined by (Y) multiplying (1) the price per hundredweight of the animal's respective weight class as determined by the CattleFax Regional Feeder price, times (2) the animal's current weight, or (Z) other means as determined by Lender.

**1.93** <u>Eligible Commodity Hedge Accounts</u> means the net equity position in favor of Borrower in Commodity Hedge Accounts, as determined by brokerage statements satisfactory to Lender (A) subject to a first priority perfected security interest in favor of Lender; (B) subject to a control agreement in favor of Lender, (C) not subject to any Lien in favor of a Person other than Lender; and (D) are otherwise acceptable to Lender.

**1.94**    <u>Eligible Customer Notes Receivable</u> means any note and related documents (in a form acceptable to the Lender) and executed by a customer of the Borrower acceptable to the Lender relating to the financing of Eligible Customer Cattle by the Borrower, or feed related to such Eligible Customer Cattle and which documents have been delivered to the Lender.

**1.95**    <u>Eligible Customer Cattle</u> means calves, heifers, steers, cows, bulls and other cattle acceptable to Lender (A) owned by a customer of Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Borrower; (C) not subject to any Lien in favor of a Person other than Borrower; and (D) otherwise acceptable to Lender.

**1.96**    <u>Eligible Dairy Cattle</u> means milk cows, dry cows, breeding bulls, heifers, calves and other dairy cattle acceptable to Lender (A) owned by Borrower, (B) located at a dairy owned or leased by Borrower; (C) subject to a first priority perfected security interest in favor of Lender; (D) not subject to any Lien in favor of a Person other than Lender; and (E) otherwise acceptable to Lender.

(a)    <u>Eligible Dairy Current Ratio</u> means the ratio of current assets (including Eligible Dairy Cattle) to current liabilities, plus any Funded Debt related to Eligible Dairy Cattle.

(b)    <u>Eligible Dairy Debt Service Coverage Ratio</u> means the ratio of Stabilized EBITDA (net of Herd Maintenance Expenses) minus Compensation (to the extent, if any, not treated as an expense for purposes of calculating EBITDA), minus Distributions, and minus cash income taxes to the current portion of Funded Debt plus interest expense, plus capital lease payments.

(c)    <u>Eligible Dairy Working Capital</u> means (a) current assets (including Eligible Dairy Cattle) minus (b) current liabilities plus any Funded Debt related to Eligible Dairy Cattle.

**1.97**    <u>Eligible Demand Deposit Accounts</u> means the balance of demand deposit accounts which are (A) owned by Borrower, (B) with Rabobank, N.A. or another financial institution approved by Lender; (C) subject to an account control agreement acceptable to Lender, or otherwise subject to a first priority perfected security interest in favor of Lender; (D) not subject to any Lien in favor of a Person other than Lender; and (E) otherwise acceptable to Lender, less uncashed checks, overdrafts and other outstanding debits related thereto.

**1.98**    <u>Eligible Feed Account Receivable</u> means Accounts Receivable related to the sale of Feed or providing of services under a feeding agreement or similar agreement otherwise acceptable to Lender which are (1) subject to a first priority perfected security interest in favor of Lender, (2) not subject to any Lien in favor of a Person other than Lender, (3) secured by the Borrower's liens on the Feed Account Receivable Related Cattle, and (4) otherwise acceptable to Lender; excluding any portion constituting advertising, finance charges, services charges, or sales or excise taxes.

**1.99**    <u>Eligible Feed and Grain Inventory</u> means Feed and other grain which is (A) owned by and in the possession of Borrower or in the possession of a bailee who has executed and returned a bailee letter to Lender, if required, in form and substance acceptable to Lender, (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; (D) not spoiled or otherwise in a condition unsuitable for feeding livestock; and (E) otherwise acceptable to Lender.

**1.100**    <u>Eligible Hedged Cattle</u> means calves, heifers, steers, cows, bulls and other cattle acceptable to Lender which are subject to a commodity hedge agreement involving hedge transactions as carried under a related Commodity Hedge Account, and which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

**1.101**    <u>Eligible Inventory</u> means Inventory which is (A) owned by and in the possession of Borrower at a location owned by Borrower or otherwise acceptable to Lender, (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

**1.102**    <u>Eligible Investment in Growing Crops</u> means the lesser of (A) actual expenses incurred in connection with the production of crops, as approved by Lender, growing on land owned by Borrower or land leased by Borrower and, at the option of Lender, to which Lender has been granted a right of access for purposes of harvesting those crops, not including one-time development costs and expenses incurred in connection with the production of crops harvested; or (B) 60% of the projected value of those crops, as determined by Lender.

**1.103**    <u>Eligible Milk Accounts Receivable</u> means Accounts Receivable resulting from the sale of fluid milk (including deferred Accounts Receivable resulting from the sale of fluid milk within the last month of the current fiscal year, as approved by Lender) (A) from a creamery acceptable to Lender, (B) subject to a first priority perfected security interest in favor of Lender and (C) are not subject to any Lien in favor of a Person other than Lender; (D) otherwise acceptable to Lender.

**1.104**    <u>Eligible Option Protected Cattle</u> means Eligible Cattle with respect to which a put option has been purchased and the strike price of the related option is no more than USD $_/cwt below the reference Cattle Futures Contract price.

**1.105**    <u>Eligible Packer Account Receivable</u> means an Account Receivable resulting from the sale of livestock to a buyer acceptable to Lender which have been shipped, not to exceed 10 days past the shipping date when due, and (A) subject to a first priority perfected security interest in favor of Lender, (B) not subject to any Lien in favor of a Person other than Lender, and (C) otherwise acceptable to Lender.

**1.106**    <u>Eligible Pasture Cattle</u> means calves, heifers, steers, cows, bulls and other cattle which are not located in a feedyard facility but which are otherwise acceptable to Lender which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

**1.107**    <u>Eligible Poultry</u> means live poultry and chickens, including broilers, layers, and live pullets,  and which are (A) owned by Borrower (not including Borrower's interest in any poultry described above, if any, which are co-owned with Borrower's customers or other Persons), (B) located in

poultry facilities owned or leased by Borrower; (C) subject to a first priority perfected security interest in favor of Lender; (D) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

**1.108    Eligible Prepaid Crop Expenses** means amounts prepaid to vendors acceptable to Lender for the purchase of goods or services used in the production of crops growing on land owned by Borrower or land leased by Borrower and, at the option of Lender, to which Lender has been granted a right of access for purposes of harvesting those crops, not including one-time development costs and expenses incurred in connection with the production of crops harvested.

**1.109    Eligible Prepaid Feed and Input Expenses** means the amounts prepaid to vendors acceptable to Lender for the purchase of Feed commodities and other inputs acceptable to Lender.

**1.110    Eligible Procurement Cattle** means calves, heifers, steers, cows, bulls and other cattle acceptable to Lender which are (A) owned by Borrower at a location approved by Lender; (B) to be resold to customers within 30 days from the date of acquisition by Borrower; (C) subject to a first priority perfected security interest in favor of Lender; (D) not subject to any Lien in favor of a Person other than Lender; and (E) otherwise acceptable to Lender.

**1.111    Eligible Real Estate** means Real Estate which is (A) owned by and in the possession of Borrower or subject to leases acceptable to Lender which are subordinated to the interests of Lender, (B) subject to a first priority mortgage or deed of trust to or for the benefit of Lender; (C) not subject to any Lien in favor of a Person other than Lender except non-delinquent ad valorem real estate taxes and assessments; (D) not subject to any covenants, restrictions or other encumbrances except those which have been expressly approved by Lender; (E) subject to a lender's policy of title insurance approved by Lender; (F) not subject to any environmental contamination or other condition of the premises or improvements unacceptable to Lender; and; and (G) otherwise acceptable to Lender.

**1.112    Eligible Swine** means isowean pigs, feeder pigs, market hogs, or other such swine acceptable to Lender which are (A) owned by Borrower at a location approved by Lender; (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in Favor of a Person other than Lender; and (D) otherwise acceptable to Lender.

**1.113    Eligible Swine Value** means the market value with respect to Eligible Swine determined by (A) multiplying (1a) the price per hundredweight at which a Hog Futures Contract (dated nearest to the estimated date on which such hogs would be finished or, in the case of feeder hogs or isowean pigs, dated nearest to the estimated date on which such hogs would meet feeder hog or isowean pig contract specifications) could be entered into by the Borrower on the date the Eligible Swine Value is determined, or (1b) the price per hundredweight of a Cash Forward Hog Contract with respect to Eligible Swine between Borrower and a reputable counterparty acceptable to Lender (plus or minus the local basis and any premiums or discounts), times (2) the number of hundredweights projected to be deliverable when such hogs are finished, then (B) subtracting the sum of (1) Hog Finishing Costs projected to be incurred, on the basis of existing market conditions, plus (2) Hog Marketing Costs. Provided, however, that if there is no available Hog Futures Contract or Cash Forward Hog Contract for reference, then the market value will be determined by (Y) multiplying (1) the price per hundredweight of the animal's respective weight class as determined by Lender, times (2) the animal's current weight, or (Z) other means as determined by Lender.

**1.114    Eligible Veterinary Supplies** means animal medicines and health supplies normally used for the care of livestock which are (A) owned by and in the possession of Borrower, (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; (D) not spoiled or otherwise in a condition unsuitable for use; and (E) otherwise acceptable to Lender.

**1.115    Environmental Information** means any evidence that Borrower is in compliance with all applicable Environmental Laws, including an environmental compliance audit of Borrower's operations conducted by a third party professional approved by Lender, a phase I environmental assessment of the Real Estate performed by a third party consultant approved by Lender and an asbestos survey of the Real Estate performed by a third party professional approved by Lender.

**1.116    Environmental Law** means all Applicable Laws relating to or imposing liability or standards of conduct concerning protection of health or the environment.

**1.117    Equipment Financed** means the equipment more particularly described in a Facility Sheet or any amendment, modification or supplement thereto with respect to any applicable Loan Type.

**1.118    Equipment Line of Credit** means any credit Lender shall extend from time to time to Borrower in accordance with the MCA or any amendment, modification or supplement thereto.

**1.119    ERISA** means the Employee Retirement Income Security Act of 1974, as amended from time to time.

**1.120    ERISA Affiliate** means any trade or business (whether or not incorporated) under common control with any Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code (and Sections 414(m) and (o) of the Internal Revenue Code for purposes of provisions relating to Section 412 of the Internal Revenue Code).

**1.121    Event of Default** means, upon Lender's election, the occurrence of any of the following:

(a)    **Non-Payment.** Any payment required under any Loan Document is not received by Lender by the first Business Day after the fourth calendar day following its scheduled due date;

(b)    **False Representation.** The Financial Information or any Borrower Representation in any Loan Document is materially incorrect or misleading;

(c)    **Covenant Violation.** The violation of or failure to comply with any Borrower Covenant;

(d)    **Taxes, Insurance, Collateral Maintenance.**  Borrower does not (i) pay (or cause payment of) all taxes assessed on the Collateral prior to the date when delinquent; (ii) maintain (or cause to be maintained) all policies of insurance required under the Transaction Documents and pay (or cause payment of) all premiums for that insurance on or prior to the date when due; and (iii) maintain the Collateral (or cause the Collateral to be maintained) in good condition and repair, all in accordance with the terms and conditions of the Transaction Documents;

(e)    **Death.**  The death of (i) any Borrower or Guarantor who is an individual, (ii) if any Borrower or Guarantor is a partnership, any general partner of that partnership who is an individual, or (iii) if any Borrower or Guarantor is the trustee under a trust acting in that capacity, any individual trustor under the trust;

(f)    **Management Change.**  A change in the present executive or management personnel of any Borrower;

(g)    **Federal Tax Lien.**  The filing of any federal tax Lien against any Borrower or Guarantor, any member or general partner of any Borrower or Guarantor, or against the Collateral and same is not discharged of record within 30 days after the date filed;

(h)    **Insolvency.**  An Insolvency Proceeding is initiated by any Borrower or Guarantor; or any Insolvency Proceeding initiated against any Borrower or Guarantor by another Person is not discharged within 60 days after filing;

(i)    **Adverse Judgment.**  Borrower or Guarantor, if any, or any Subsidiary are or become subject to a Judgment or Judgments: (i) for the payment of money in an aggregate amount (as to all such Judgments or orders) exceeding the Judgment Threshold Amount, which are not covered by independent third-party insurance as to which the insurer does not dispute coverage, or (ii) that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon any such Judgment, or (B) there is a period of ten consecutive days during which a stay of enforcement of any such Judgment, by reason of a pending appeal or otherwise, is not in effect;

(j)    **Other Loan Document Default.**  Any "default" or "Event of Default" as that term is defined in any Loan Document other than the MCA which is not cured within any applicable cure or grace period;

(k)    **Cross-Collateralized Loan Document Default.**  Any default in the payment or performance of a term or condition of any Cross Collateralized Loan Document which is not cured within any applicable cure or grace period;

(l)    **Default Under Any Other Loan.**  Any default in the payment or performance of a term or condition of any credit agreement, note, security agreement, Mortgage, deed of trust, deed to secure debt, or other agreement or instrument evidencing or securing any other indebtedness, liabilities or Obligations of Borrower to Lender or Rabobank, RNA, or any other Affiliate of Lender, or any Swap Counterparty;

(m)    **Hedging Agreement Default.**  Any default termination event or other similar event under any Hedging Agreement which is not cured within any applicable cure or grace period;

(n)    **Material Adverse Effect.**  Any Material Adverse Effect as to any Borrower or Guarantor;

(o)    **Monetary Default After Notice.**  For more than ten days after Notice from Lender, Borrower is in default under any term, covenant or condition of the MCA not previously described in this definition, which can be cured by the payment of a sum of money; and

(p)    **Non-Monetary Default After Notice.**  For 30 days after Notice from Lender, Borrower is in default under any term, covenant or condition of the MCA not previously described in this definition; provided that if (i) it is reasonably certain that the default cannot be cured by Borrower within that 30 day period and (ii) Borrower has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period will be extended for so long as reasonably required by Borrower in the exercise of due diligence to cure that default, up to a maximum of 90 days after the Notice to Borrower of the Event of Default.

1.122    **Exceptions to Non-Recourse** means, collectively, (a) Lender's rights under any guaranty, indemnification (including any indemnity with respect to Environmental Laws or Hazardous Substances), agreement to hold harmless, master lease or similar instrument contained in or made in connection with the Loan Documents; (b) Lender's right to rents and profits, deposits, insurance proceeds or Condemnation Awards; (c) Losses incurred by Lender due to fraud or misrepresentation by or on behalf of Borrower in connection with the Loans; (d) Losses incurred by Lender due to waste or willful damage to the Collateral caused or suffered by Borrower; (e) Losses incurred by Lender due to the nonpayment real estate taxes, assessments, ground rents or other impositions on the Collateral (including reimbursement for any such amounts paid by Lender); (f) Losses incurred by Lender due to any failure to maintain and pay premiums in connection with policies of insurance required under the terms of the Loan Documents (g) court costs, Legal Fees and other expenses of Lender incurred in connection with an Event of Default.

1.123    **Excess Payments** means any permitted Prepayments or permitted excess payments more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

1.124    **Facility Sheet** means an agreement titled "Facility Sheet" whether now or hereafter entered into with Lender setting forth the principal terms, covenants, definitions and Reporting Requirements applicable to any Note with respect to any Loan of any Loan Type entered into in connection with the MCA.

1.125    **Federal Flood Insurance** means flood insurance which has been made available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994 (as such acts may from time to time be amended).

1.126    **Feed** means grain, silage and other roughage feed, feed ingredients, and finished feed normally used for feeding livestock.

1.127    **Feed Account Receivable Related Cattle** means cattle in the possession of the Borrower which are subject to a first lien under common law or statutory first liens in favor of Borrower securing the Eligible Feed Accounts Receivable, as long as Borrower has taken all action required to perfect such lien and to be entitled to the priority afforded thereby.

1.128    **FFSC** means the Financial Guidelines for Agricultural Producers, published by the Farm Financial Standards Council.

1.129    **Financial Covenant** means any covenant contained in the Loan Documents regarding the financial status of a Person other than Lender.

1.130    **Financial Information** means all financial statements and other reports, documents, instruments, information and forms of evidence concerning Borrower, Guarantor, if any, the Collateral, or any other fact or circumstance, delivered to Lender in connection with Borrower's application for any Loan, Lender's underwriting and approval of any Loan, or the MCA and the other Loan Documents.

1.131    **Fixed Rate** means with respect to each applicable Loan Type, that rate determined by Lender and agreed to by Borrower on or before two Business Days prior to the date on which interest at that rate shall begin to accrue, fixed for the remainder of the term of the applicable Loan Type, more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

1.132    **Fixed Rate Loan** means a Loan which bears interest at a Fixed Rate.

1.133    **Fixed Rate Lockout Period** means any period of time for a Fixed Rate Loan which Prepayments are not permitted.

1.134    **Floor Rate** means the minimum per annum Interest Rate that may be charged on a Loan.

1.135    **Funded Debt** means all outstanding long term liabilities for money borrowed for non-consumer purposes, other long term interest-bearing non-consumer liabilities, and capital leases.

1.136    **GAAP** means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, consistently applied and as in effect from time to time.

1.137    **Governmental Authority** means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

1.138    **Guarantor** means any Party that is designated in a Facility Sheet from time to time as a guarantor and who from time to time enters into any Guaranty.

1.139    **Guaranty** means any guaranty (if any) from time to time entered into in connection with any Loan made hereunder for the benefit of Lender and/or Collateral Agent.

1.140    **Hard Costs** means the costs of all labor, materials, equipment, fixtures and furnishings necessary for final completion of the Project.

1.141    **Hazardous Substance** means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "caustic," "pollutant," or "contaminant" or a similar designation or regulation under any Environmental Law, and shall also include, without limitation, asbestos, polychlorinated biphenyl, petroleum, petroleum products, and natural gas.

1.142    **Hedging Agreement** means any derivatives, swaps, caps, collars or other similar agreement between Borrower and a Swap Counterparty, for the purpose of fixing or limiting interest expense, or any foreign exchange, currency hedging, commodity hedging, security hedging or other agreement between Borrower and a Swap Counterparty, for the purpose of limiting the market risk of holding currency, a security or a commodity in either the cash or futures markets.

1.143    **Hedging Obligations** means all indebtedness, liabilities and Obligations of Borrower under any Hedging Agreement, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several.

1.144    **Herd Maintenance Expenses** means the cost of self-raised dairy cows added to the dairy cattle herd, if any; plus the cost of purchased cows added to the herd; if any, less income from the sale or other disposition of cull cows, if any.

1.145    **Hog Finishing Costs** means the aggregate of all costs and expenses for Feed, medicine, shelter and all other items of cost or expense which are customarily or otherwise expected to be incurred to bring hogs to a weight at which they are to be sold for slaughter.

1.146    **Hog Futures Contract** means a contract for the future sale of hogs ("isowean pigs", "feeder hogs", "lean hogs", "live hogs" or otherwise, as acceptable to Lender) which has been entered into or could have been entered into by the owner of such hogs and priced on a lean hog futures basis through the Chicago Board of Trade, the Chicago Mercantile Exchange, the Kansas City Board of Trade or any other United States contract market subject to the jurisdiction of the Commodity Futures Trading Commission, acceptable to Lender.

1.147    **Hog Marketing Costs** means reasonable expenses to be incurred in the sale of the hogs at the point for delivery under a Hog Futures Contract.

**1.148**    **In Balance** means that the amount of the undisbursed portion of the Maximum Amount for the Construction Line of Credit, plus any sums on deposit in Borrower's Funds Account, plus any sums Lender has agreed may be paid by Borrower as they come due, are sufficient to complete the Project.

**1.149**    **Indemnified Persons** means, collectively, the Lender, its officers, directors, employees, partners, agents and attorneys.

**1.150**    **Indemnified RNA Liabilities** means all indebtedness, liabilities and Obligations of Borrower to RNA, in connection with banking products and services provided by RNA to Borrower, if any, including all Obligations of Borrower to RNA as a result of: (a) deposits of credit items that are returned by the issuing bank; (b) ACH debit items originated by Borrower which settle with insufficient funds in Borrower's deposit account; (c) letters of credit issued by RNA for the benefit of Borrower; (d) trade finance services; and (e) all service charges and fees posted to the account.

**1.151**    **Individual** means in connection with any definition, financial report or financial covenant, each applicable Person, not in combination of other applicable Persons or their Subsidiaries.

**1.152**    **Initial Principal Payment Date** means the first date of principal payment, together with all unpaid accrued interest on the Loan, and other charges under the terms of each Facility Sheet or any amendment, modification or supplement thereto or other sources in such amounts as necessary to comply each Facility Sheet.

**1.153**    **Insolvency Proceeding** means the insolvency of a Person, the appointment of a receiver of any part of Person's property, an assignment by a Person for the benefit of creditors, or the commencement of any proceeding under the Bankruptcy Code or any other bankruptcy or insolvency law, by or against a Person.

**1.154**    **Installment Payment** means regularly scheduled payments made during the Loan's Amortization Period more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

**1.155**    **Integrator** means the Person(s) who holds or has contracted with Borrower under an Integrator Contract(s) for the production of all or a portion of the poultry and/or swine grown or cared for by Borrower and located at or in connection with the Collateral.

**1.156**    **Integrator Contract** means the poultry and/or swine contract entered into between an Integrator(s) and the Borrower for the production of the poultry and/or swine grown or cared for by Borrower and located at or in connection with the Collateral.

**1.157**    **Integrator Payment** means all payments or other compensation made by and Integrator(s) to Borrower pursuant to an Integrator Contract(s).

**1.158**    **Interest Coverage Ratio** means the ratio of EBITDA to interest expense.

**1.159**    **Interest Payment Date** means a date on which regularly scheduled payments of interest are due.

**1.160**    **Interest Period** means (a) with respect to each applicable LIBOR Rate Loan and Long Term Adjustable Rate Loan, each period commencing on the date that any initial LIBOR Rate Loan or initial Long Term Adjustable Rate Loan is made with respect to each applicable Loan Type, or the applicable rate is recalculated, until the next Adjustment Date or, if earlier, the respective Maturity Date; and (b) with respect to each applicable LIBOR Rate Loan, the period selected by Borrower or agreed to between Borrower and Lender, during which the applicable LIBOR Rate will be effective; except that Borrower may not select any Interest Period which would extend beyond the Maturity Date of the respective Loan, each LIBOR Rate Interest Period which commences on the last Business Day of a month (or on any day for which there is no numerically corresponding day in the appropriate subsequent month) shall end on the last Business Day of the appropriate subsequent month, each LIBOR Rate Interest Period which would otherwise end on a day which is not a Business Day shall end on the next succeeding Business Day, and unless otherwise determined by Lender, no Interest Period for any LIBOR Rate Loan shall have a duration of less than one month, and, if the Interest Period would otherwise be a shorter period, the related LIBOR Rate Loan shall not be available.

**1.161**    **Interest Rate** means with respect to each applicable Loan, the applicable interest rate for such Loan as set forth in the MCA or any amendment, modification or supplement thereto for that Loan and including the Interest Rate Margin, if any, set forth in the MCA or any amendment, modification or supplement thereto.

**1.162**    **Interest Rate Margin** means the percentage margin used to calculate any rate of interest which is determined by adding together a published rate and a percentage set by Lender and set forth in the MCA or any amendment, modification or supplement there for any applicable Loan.

**1.163**    **Internal Revenue Code** means the Internal Revenue Code of 1986, as amended from time to time.

**1.164**    **Inventory** means Inventory which: (A) is not (1) packaging or shipping materials, (2) goods used in connection with maintenance or repair of properties or assets owned by Borrower, Guarantor, or any Affiliate or Subsidiary of Borrower, (3) general supplies or (4) work-in-process; (B) complies with all standards, if any, imposed by Governmental Authorities; (C) complies with all warranties, representations and covenants in the loan documents relating thereto; (D) is not unacceptable to Lender due to age, type, category, quality and/or quantity; and (F) is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreement of any other Person that would materially restrict Lender's ability to sell or otherwise dispose of such Inventory ; provided, that Lender may, consistent with Lender's normal credit practices, from time to time upon 30 days prior written notice to Borrower, designate categories of ineligible Inventory in addition to those above; provided, also, that such designation shall be immediately effective upon the occurrence of an Event of default or if an Event of default is in existence at the time of such designation.

**1.165**    **Investment** means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint

venture interest in such other Person and any arrangement pursuant to which the investor guarantees indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit; provided, that for purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without Adjustment for subsequent increases or decreases in the value of such Investment.

1.166    **Judgment** means a judgment, order, writ, injunction, decree, or rule of any court, arbitrator, or Governmental Authority.

1.167    **Judgment Threshold Amount** means the amount specified in the MCA or any amendment, modification or supplement thereto of a Judgment against any Borrower or Guarantor or any Subsidiary for the payment of money in an aggregate amount (as to all such Judgments or orders).

1.168    **Legal Fees** means any and all counsel, attorney, paralegal and law clerk fees and disbursements, including, but not limited to fees and disbursements at the pre-trial, trial, appellate, discretionary review, or any other level, incurred or paid by Lender in protecting and enforcing its rights and interests under the Loan Documents or the Cross Collateralized Loan Documents.

1.169    **Lender** shall have the meaning specified in the preamble of the MCA and any successors and assigns of any of its rights and Obligations under the MCA.

1.170    **Letter of Credit** and "Letters of Credit" shall mean, respectively, a letter of credit and all such letters of credit (whether direct or confirming), issued by the Lender (or caused to be issued by Lender), in its sole discretion, upon the execution and delivery by the Borrower and acceptance by the Lender of a Letter of Credit Reimbursement Agreement and a Letter of Credit Application pursuant to a Letter of Credit Facility.

1.171    **Letter of Credit Application** shall mean, with respect to any request for the issuance of a Letter of Credit, a letter of credit application in the form being used by Lender at the time of such request for the type of Letter of Credit requested.

1.172    **Letter of Credit Facility** means any loan made by Lender to Borrower pursuant to the MCA or any amendment, modification or supplement thereto.

1.173    **Letter of Credit Reimbursement Agreement** shall mean, at any time, with respect to the issuance of Letters of Credit, a Letter of Credit Reimbursement Agreement in the form being used by Lender at such time.

1.174    **Letter of Credit Repayable on Demand** shall mean the amount of any draws made by a beneficiary under a Letter of Credit shall be payable by Borrower upon the earlier of (i) the Lender's demand for repayment, or (ii) five (5) days from the date of such draw by such beneficiary by the Lender.

1.175    **Letter of Credit Repayable over Time** shall mean the amount of any draws made by a beneficiary under a Letter of Credit shall be payable by Borrower pursuant to the terms and conditions of the Revolving Line of Credit Note pursuant to which the Letter of Credit was issued.

1.176    **LIBOR Rate** means, for any Interest Period, the rate of interest published in the "Money Rates" section of The Wall Street Journal (or if The Wall Street Journal is not available or does not publish that rate, any other authoritative source of that rate, selected by Lender from time to time for purposes of providing quotations of Interest Rates applicable to dollar deposits in an amount equal to the applicable Loan in the London interbank market at approximately 11:00 a.m., London time) on the London Banking Day immediately preceding the commencement of the Interest Period, as the rate for dollar deposits with a thirty (30) day maturity or as the rate for dollar deposits with such other maturity to which Party and Lender may agree, as set forth in each Facility Sheet; provided, that the LIBOR Rate shall be increased by an Interest Rate Margin as set forth in the MCA or any amendment, modification or supplement thereto and may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs. The LIBOR Rate shall be Adjusted on the first day of the applicable LIBOR Rate Interest Period.

1.177    **LIBOR Rate Continuation** means with respect to each applicable Loan Type, the continuation of any LIBOR Rate Loan for another Interest Period.

1.178    **LIBOR Rate Conversion** means with respect to each applicable Loan Type, a Rate Conversion of any LIBOR Rate Loan.

1.179    **LIBOR Rate Interest Period** means LIBOR Rate plus the applicable Interest Period.

1.180    **LIBOR Rate Loan** means a Loan which bears interest at the LIBOR Rate set forth in each Facility Sheet.

1.181    **LIBOR Rate Prepayment Costs** means that amount as determined by Lender as its loss, cost or expense incurred as a result of: (a) the Prepayment of a LIBOR Rate Loan on a day other than the last day of the Interest Period for that LIBOR Rate Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); and (b) any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain that LIBOR Rate Loan or from fees payable to terminate the deposits from which those funds were obtained. Borrower shall also pay any administrative fees charged by Lender in connection with any event described in this paragraph above. For purposes of calculating amounts payable by Borrower to Lender under the terms of this section, Lender will be deemed to have funded each LIBOR Rate Loan by a matching deposit or other borrowing in the London interbank Eurodollar market for a comparable amount and for a comparable period, whether or not that LIBOR Rate Loan was in fact so funded.

1.182    **Lien** means any Mortgage, pledge, assignment, deposit arrangement, privilege, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

**1.183**    <u>Line of Credit</u> means the Revolving Line of Credit, the Non-revolving Line of Credit, the RELOC, the Construction Line of Credit or the Equipment Line of Credit.

**1.184**    <u>Line of Credit Loan</u> means a loan made by Lender to Borrower under a Line of Credit.

**1.185**    <u>Loan</u> means any advance of funds by Lender of any Loan Type.

**1.186**    <u>Loan Documents</u> means the MCA, the Facility Sheet(s), the Applicable Obligor Covenants Schedule, the Notes, Security Instruments, UCC-1s, any Guaranty, the Schedule of Definitions and Covenants, Other Schedule and all other agreements and instruments required by Lender for purposes of evidencing or securing any Loan, now existing or hereinafter amended, modified or supplemented between Lender and any Borrower.

**1.187**    <u>Loan Month</u> means, whenever the Closing Date occurs on the first day of the month, the calendar month in which the Closing Date occurs and each subsequent calendar month, and whenever the Closing Date occurs on a date other than the first of the month, means the calendar month immediately following the calendar month during which the Closing Date occurs, and each subsequent calendar month.

**1.188**    <u>Loan Obligations</u> means all indebtedness, liabilities and Obligations of Borrower to Lender arising pursuant to any of the Loan Documents and any Loan Type, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several.

**1.189**    <u>Loan Opening Conditions</u> shall be the conditions to Lender's obligation to make the initial Loan as set forth in the MCA.

**1.190**    <u>Loan Product Conversion</u> means a change in the rate of interest, required payments and any other terms and conditions under which Lender would agree to convert the Loan to a fixed or long term adjustable rate term loan more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

**1.191**    <u>Loan Request</u> means a request for a Loan made by Borrower of Lender.

**1.192**    <u>Loan Type</u> means the type of Loan being entered into between Borrower and Lender from time to time as set forth in the MCA and Facility Sheet(s), or any amendment, modification or supplement thereto.

**1.193**    <u>Loan Year</u> means the one calendar year period beginning with the first calendar month following the calendar month in which the applicable Closing Date or (in the case of the Conversion only) the Conversion Date, occurs, and each subsequent one calendar year period.

**1.194**    <u>London Banking Day</u> means a day on which banks are open for dealings in dollar deposits in the London interbank market.

**1.195**    <u>Long Term Adjustable Rate</u> means with respect to each applicable Loan Type, that rate, if any, agreed to between Lender and Borrower as the rate which Borrower may select pursuant to its rights under each applicable Loan Type, effective for that period of time, if any, agreed to between Lender and Borrower with respect to each applicable Loan Type, subject to Adjustment to whatever rate of interest of which Lender notifies Borrower prior to the Adjustment Date, more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

**1.196**    <u>Long Term Adjustable Rate Adjustment Date</u> means each date on which the rate of interest on a Long Term Adjustable Rate Loan is or may be Adjusted by Lender pursuant to the MCA or any amendment, modification or supplement thereto.

**1.197**    <u>Long Term Adjustable Rate Loan</u> means a Loan which bears interest at a Long Term Adjustable Rate.

**1.198**    <u>Long Term Adjustable Rate Lockout Period</u> means any period of time for a Long Term Adjustable Rate Loan which Prepayments are not permitted.

**1.199**    <u>Losses</u> means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, Obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, Judgments, awards, amounts paid in settlement of whatever kind or nature (including Legal Fees).

**1.200**    <u>Margin Adjustment Date</u> means onset date and successive periods that the Interest Rate Margin will Adjust as set forth in the MCA or any amendment, modification or supplement thereto.

**1.201**    <u>Master Guaranty</u> means any master guaranty (if any) from time to time entered into in connection with any Loan made hereunder for the benefit of Lender and/or Collateral Agent.

**1.202**    <u>Material Adverse Effect</u> means any set of circumstances or events which (a) has or could reasonably be expected to have any material adverse effect as to the validity or enforceability of any Transaction Document or any material term or condition therein against the applicable Person; (b) is or could reasonably be expected to be material and adverse to the financial condition, business assets, operations, or property of the applicable Person; or (c) materially impairs or could reasonably be expected to materially impair the ability of the applicable Person to perform the Obligations.

**1.203**    <u>Maturity Date</u> means, with respect to each Loan, the Maturity Date set forth in the MCA and Facility Sheet(s) or any amendment, modification or supplement thereto for such Loan, or any other earlier date when, under the terms of the MCA, the entire unpaid principal amount of such Loan is due.

1.204    **Maximum Amount** means with respect to each applicable Loan Type, that amount denoted as the Maximum Amount in the Facility Sheet or any amendment, modification or supplement thereto.

1.205    **Maximum Rate** means that rate per annum which, under Applicable Law, may be charged without subjecting Lender to civil or criminal liability, or limiting Lender's rights under the Loan Documents as a result of being in excess of the maximum Interest Rate which Borrower is permitted to contract or agree to pay; except that the Maximum Rate on any amount upon which Lender is not permitted to charge interest will be zero percent.

1.206    **MCA** means the Master Credit Agreement by and between the Parties and Lender in effect from time to time as may be amended, modified or supplemented from time to time, including without limitation any schedules, addendums, exhibits or attachments thereto.  Only one MCA may be in effect between Parties and Lender at any one time.

1.207    **Minimum Principal Payment** means principal payments, together with all unpaid accrued interest on the Loan, and other charges under the terms of each Facility Sheet or other sources in such amounts as necessary to comply each Facility Sheet.

1.208    **Mortgage** means any mortgage/deed of trust/deed to secure debt/trust deed, or assignment of rents now or hereafter entered into by Borrower in favor of Collateral Agent and encumbering all or any portion of the Collateral described therein.

1.209    **Non-Borrower** means any Person who executes any MCA or any amendment, modification or supplement thereto or Loan Document for purposes of granting a Lien in Collateral but is not personally liable for such Loan.

1.210    **Non-revolving Line of Credit** means any applicable Loan made by Lender to Borrower pursuant to the MCA or any amendment, modification or supplement thereto.

1.211    **Note** means each promissory note entered into by Borrower in favor of Lender to evidence any Loan, and any other evidence of indebtedness delivered in connection with the MCA more particularly described in each Facility Sheet or any amendment, modification or supplement thereto.

1.212    **Notice of Early Termination** means Lender's option to accelerate the Maturity Date by Notice to Borrower, electing to terminate the Line of Credit as of the Annual Anniversary Date.

1.213    **Notice of Election to Prepay** means any Notice given by Borrower to Lender which informs Lender of its decision to elect to Prepay the entire unpaid principal balance of the Loan that is the subject of the Notice of Election to Prepay, together with all accrued interest and all other charges due under the Conversion.

1.214    **Notices** means all requests, notices, approvals, consents, and other communications sent between the parties to the MCA or to any of the Loan Documents.

1.215    **Obligations** means the Loan Obligations and the Hedging Obligations.

1.216    **OFAC** means the Office of Foreign Assets Control.

1.217    **Optional Rate Conditions** shall mean the following:

    (a)    **Rate Request.**  Lender must receive a Rate Request;

    (b)    **Time of Request.**  At Lender's option, all Rate Requests must be received by Lender before12:00 noon (St. Louis, Missouri time), on

        (i)    In the case of a LIBOR Rate Conversion or LIBOR Rate Continuation, a Business Day which is not less than two Business Days prior to the date of the LIBOR Rate Conversion or LIBOR Rate Continuation and

        (ii)    in the case all other Rate Conversions, a Business Day which is not less than one Business day prior to the date of that Rate Conversion; and

    (c)    **LIBOR Conversion.**  A Rate Conversion of a LIBOR Rate Loan may take place only on the last day of the respective Interest Period.

    (d)    **No Default.**  Except for any Rate Conversions into any Base Rate Loan, no Rate Conversions or LIBOR Rate Continuations will be made while there exists an Event of Default or an event which, with the passage of time or the giving of Notice would be an Event of Default, or if the Interest Rate for that Loan would exceed the Maximum Rate.

    (e)    **Irrevocable.**  Each Rate Request will be irrevocable.

    (f)    **Automatic Conversion.**  If there is an Event of Default, or if Borrower fails to select the Interest Rate applicable to a Loan or portion thereof or the duration of any Interest Period for any LIBOR Rate Loan within the time period and otherwise as provided in this section, that Loan (if other than a Base Rate Loan) will be automatically converted to a Loan bearing interest at the applicable Base Rate on the last day of the Interest Period for that Loan or (if outstanding as a Base Rate Loan) will remain as, or (if not then outstanding) will be made as, a Base Rate Loan.

  **(g)**  **Limitations on Number and Size.** The unpaid principal amount of any Loan of any Loan Type must at no time be subject to more than five different rates of interest. The portion of any Loan of any Loan Type initially subject to each rate other than the Base Rate must be no less than $200,000.00.

 **1.218** **Optional Rates** means one or more of the following Interest Rates as selected by Borrower and applicable to an advance or portions of a Loan:

  **(a)**  **Base Rate.** The Base Rate;

  **(b)**  **LIBOR.** The LIBOR Rate;

  **(c)**  **Long Term Adjustable.** The Long Term Adjustable Rate; and

  **(d)**  **Fixed.** The Fixed Rate.

 **1.219** **Original Payment Dates** means the dates on which the Prepaid principal would have been paid if there had been no Prepayment. If any of the principal would have been paid later than the end of the Interest Period in effect at the time of Prepayment, then the Original Payment Date for that amount will be the last day of the Interest Period.

 **1.220** **Other Obligations** means all other indebtedness, liabilities and Obligations of Borrower to Lender or Rabobank or any of their Affiliates which are not Loan Obligations or Hedging Obligations.

 **1.221** **Other Schedule** means collectively any Facility Sheet, Applicable Obligor Covenants Schedule or other schedules incorporated by reference into the MCA.

 **1.222** **Out of Balance** means that the amount of the undisbursed portion of the Maximum Amount, plus any sums on deposit in Borrower's Funds Account, plus any sums Lender has agreed may be paid by Borrower as they come due, are insufficient to complete the Project.

 **1.223** **Parties** means any and all parties to the MCA or to any of the Loan Documents.

 **1.224** **Party** refers only to a named party to the MCA or another Loan Document, as the context requires.

 **1.225** **Permits** means all permits, licenses and approvals of any kind of nature necessary or appropriate to construct, occupy and operate Borrower's business.

 **1.226** **Permitted Debt** means the following if not otherwise prohibited under the Loan Documents: (a) liabilities and obligations to Lender or any of its Affiliates; (b) normal trade credit; (c) if an individual, additional debts as an individual for primarily consumer purposes.

 **1.227** **Permitted Investments** means the following if not otherwise prohibited under the Loan Documents: (a) Investments made prior to the date of this Agreement and disclosed to Lender in writing; (b) Investments in current Subsidiaries; and (c) Investments in certificates of deposit, obligations of the federal government, or readily marketable securities.

 **1.228** **Permitted Liens** means the following if not otherwise prohibited under the Loan Documents: (a) Liens in favor of Lender or any of its Affiliates; (b) if an individual, additional Liens against the personal assets of that individual as an individual, to secure debt for primarily consumer purposes; (c) Liens for taxes not yet due.

 **1.229** **Permitted Loans** means the following if not otherwise prohibited under the Loan Documents: (a) extensions of credit made prior to the date of this agreement and disclosed to Lender in writing on or before the date of this agreement; (b) extensions of credit to current Subsidiaries; (c) extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to persons other than family members, Subsidiaries, and Affiliates.

 **1.230** **Permitted Over-Advance** means Lender approved Loan Requests which exceed the Maximum Amount thereof under the terms of each Facility Sheet.

 **1.231** **Permitted Sales** means the following if not otherwise prohibited under the Loan Documents: (a) sales or transfers of inventory in the ordinary course of business.

 **1.232** **Person** means an individual, a corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or other business entity, or a government or any agency or political subdivision thereof.

 **1.233** **Plan** means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Borrower or, with respect to any such plan that is subject to Section 412 of the Internal Revenue Code or Title IV of ERISA, any ERISA Affiliate of any Borrower.

 **1.234** **Plans and Specifications** means collectively, the final plans and specifications for the Project approved by Lender, which describe and show the labor, materials, equipment, fixtures and furnishings necessary for the final completion of the Project, including all amendments and modifications thereof made by changes approved by Lender or otherwise permitted under the MCA.

 **1.235** **Prepaid** means when a Prepayment has been made.

1.236    <u>Prepay</u> means to make a Prepayment.

1.237    <u>Prepayment</u> means a payment of all or a portion of the unpaid principal balance of any applicable Loan prior to the date when due, whether voluntary, by reason of acceleration, or otherwise.

1.238    <u>Prepayment Conditions</u> means the following:

    (a)    <u>Lender May Refuse.</u>  Lender may refuse to accept any Prepayment not expressly permitted in the MCA;

    (b)    <u>Effect of Notice of Prepayment.</u>  If a Prepayment is conditioned upon prior Notice to Lender, at the option of Lender,

        (i)    That Notice will be irrevocable;

        (ii)    A Prepayment will be due in the amount and on the date specified in that Notice; and

        (iii)    That Notice will not affect Borrower's obligation to make all other payments required under the Loan Documents on the date when due;

    (c)    <u>Accrued Interest and Fee.</u>  Prepayments of any applicable Loan must be accompanied by unpaid accrued interest and the Prepayment Fee, if applicable;

    (d)    <u>All Amounts Due.</u>  Permitted Prepayments of any applicable Loan are subject to payment of all amounts then due under such applicable Loan;

    (e)    <u>Application of Prepayment.</u>  Each Prepayment of a portion of any applicable Loan will be applied to the most remote payment of the principal due under such Loan;

    (f)    <u>Effect of Acceptance.</u>  If Lender receives any Prepayment which Lender is permitted to refuse, Lender may accept the Prepayment and Lender may, as a condition of acceptance, require the payment of interest which would accrue on the amount Prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount Prepaid would be due under the MCA, whichever is earlier;

    (g)    <u>Application of Fee.</u>  The Prepayment Fee shall apply to all Prepayments of any applicable Loan, including any payments or Prepayments made upon the acceleration of the due date of such Loan because of default or otherwise, and such Prepayment Fee shall be payable in addition to any default interest and other sums required to be paid under such Loan;

    (h)    <u>Insurance and Condemnation.</u>  The application of the proceeds of insurance or of a Condemnation Award in reduction of the indebtedness shall require payment of Prepayment Fee;

    (i)    <u>LIBOR Prepayment.</u>  Borrower shall have no right to Prepay any LIBOR Rate Loan bearing an Interest Period except at the end of an Interest Period; and

    (j)    <u>Last 30 Days Free.</u>  Notwithstanding any provisions of the Loan Documents to the contrary, no Prepayment Fee shall be due if Borrower voluntarily Prepays a Loan in full within the period of thirty (30) days immediately preceding the Maturity Date; provided that on the date such Prepayment is made, no Event of Default (or event which, with the passage of time or the giving of Notice, or both, would be an Event of Default) shall have occurred and still be outstanding.

1.239    <u>Prepayment Fee</u> means a fee payable to Lender in connection with the Prepayment of any applicable Loan as fair and reasonable consideration to compensate the Lender in connection with such Loan that is made on the basis and assumption that Lender would receive the payments of principal and interest set forth therein for the full term of such Loan.

1.240    <u>Prepayment Free Percentage</u> means a percentage of principal advanced that may be Prepaid with no fee in any calendar year.

1.241    <u>Prepayment Options</u> means one of the following:

    (a)    <u>Prepayment Completely Locked Out</u> means that no Prepayment of a Loan, in full or in part, is permitted except as may be permitted or required by Lender in the event of a casualty or condemnation as provided in the Loan Documents.  The Lender reserves the right to require principal reduction payments for release of Collateral or for the modification of Loan Documents.  The application of proceeds of insurance or of a Condemnation Award in reduction of the applicable Loan, if permitted or required by the Lender shall be deemed a Prepayment and shall require Borrower to pay a Prepayment Fee.  The amount of the Prepayment Fee shall be equal to the amount of interest which would have accrued on the Prepaid sum from the date of Prepayment until the next date on which the applicable Interest Rate is Adjusted, or if none, the Maturity Date of the applicable Loan.

    (b)    <u>Prepayment Locked Out Period</u> means a period of time following the making of a Loan during which no Prepayment of a Loan, in full or in part, is permitted.  The applicable Loan may be Prepaid following the Prepayment Locked Out Period upon payment of the applicable Prepayment Fee.

(c)    **Prepayment Open** means that, subject to the Prepayment Conditions, after making all scheduled principal and interest payments due on the applicable Loan and following the passage of any Prepayment Locked Out Period, Prepayment of a Loan may be made at any time without Prepayment Fee.

(d)    **Prepayment Yield Maintenance** means that, subject to the Prepayment Conditions, after making all scheduled principal and interest payments due on the applicable Loan and following the passage of any Prepayment Locked Out Period, the Borrower shall have the privilege of making any of the following payments of principal before such principal is due: (1) On any date on which interest is scheduled to be paid, the Borrower may make payments in multiples of $100 of additional sums to be applied in reduction of principal, without fee, provided the amount so paid in any calendar year (January 1 to December 31) shall not exceed the Prepayment Free Percentage of the principal advanced hereunder and this right shall be non-cumulative; (2) On any date in any calendar year (January 1 to December 31) on which interest is scheduled to be paid, the Borrower may make payments in multiples of $100 of sums in reduction of principal, in addition to any amounts paid under clause "(1)" of this paragraph, upon payment of a fee of an amount to compensate the Lender for the present value of the difference between the Interest Rate under this Note and comparable Treasury yields as Adjusted by a Reinvestment Spread which amount is equal to the product of the two fractions defined in "I" and "II" below which product is expressed in the mathematical formula set forth below in "III." In addition, following any applicable Prepayment Locked out Period, on any date other than a date on which the above privileges may be exercised, the Borrower may Prepay the applicable Loan in full upon payment of a fee of an amount to compensate the Lender for the present value of the difference between the Interest Rate under the applicable Loan and comparable Treasury yields as Adjusted by a Reinvestment Spread, which amount is equal to the product of the two fractions defined in "I" and "II" below, which product is expressed in the mathematical formula set forth below in "III":

(i)    The numerator of the first fraction is equal to the product of (A) the amount of principal to be Prepaid (designated as "P" in the formula below) and (B) the amount by which the Interest Rate, stated as a decimal, in effect under this Note at the time of the Prepayment of principal, as Adjusted to reflect an assumption of semiannual payments (Bond Equivalent Yield, as defined in "V" below) as determined solely by the Lender hereof regardless of the actual payment schedule (designated as "i" in the formula below) exceeds the sum of (a) the Treasury Rate (as defined below and designated as "t" in the formula below) and (b) the Reinvestment Spread.  The denominator of the first fraction is equal to two (2).

(ii)    The numerator of the second fraction is equal to the difference of (A) one (1) minus (B) a fraction the numerator of which is equal to one (1) and the denominator of which is the sum of (a) one half of the sum of (x) the Treasury Rate (as defined below and designated as "t" in the formula below) and (y) the Reinvestment Spread and (b) one (1), all of said sum then raised to a power equal to the number of semiannual periods then remaining in the loan term (the number of months and partial months then remaining in the loan term divided by six and rounded up to the next whole number) or, if sooner, the number of semiannual periods then remaining prior to the next date on which the applicable Interest Rate is Adjusted (designated as "n" in the formula below).  The denominator of the second fraction is equal to one half of the sum of (x) the Treasury Rate (as defined below and designated as "t" in the formula below) and (y) a Reinvestment Spread of 1.50%.

(iii)    Assuming that the Reinvestment Spread is 1.5% (0.010), the formula for computing the Prepayment yield maintenance Fee may be expressed mathematically as:

$$\text{Yield Maintenance Fee} \quad \frac{[i-(t+0.015)] \times P}{2} \quad \times \quad \frac{1 - \dfrac{1}{[1+\{(t+0.015)/2\}]^{n}}}{(t+0.015)/2} \quad =$$

(iv)    Notwithstanding anything to the contrary herein contained, in no event shall the Yield Maintenance Fee be less than an amount equal to 1.0% of the outstanding principal to be Prepaid.

(v)    The conversion of the Interest Rate hereunder, if the payment of interest is on a schedule other than semiannual, to reflect an assumption of semiannual payments (Bond Equivalent Yield) as called for in "I" above is accomplished by means of the following formula in which "i" = the Interest Rate stated as a decimal (e.g. 10% = 0.10); and "n" = number of scheduled interest payments per year under this Note:

$$\text{Bond Equivalent} \quad \left[ \left\{ (1+i/n)^{n} \right\}^{.5} - 1 \right] \times 2 \quad \text{Yield} =$$

(vi)    For purposes of the calculations herein, specifically including the calculations of the amount being Prepaid and of the loan term, it shall be conclusively presumed that the Borrower would have (on the next available date occurring after, the Prepayment to which any other privilege above applies) made one, and only one, allowed 10% Prepayment without fee under clause "(1)" above.

(vii)    The term "Treasury Rate" means a rate per annum, expressed as a decimal calculated to five digits, equal to the yield on the interpolated Treasury Constant Maturity maturing on the Yield Maintenance Date as published by the Federal Reserve System or as reported by the Department of the Treasury as of the fifth business day prior to the date of receipt of Prepayment of principal by Lender.

(viii)    The term "Yield Maintenance Date" means the date which is the first to occur of a regularly scheduled date on which the Interest Rate is Adjusted, if any, or the Maturity Date hereof.

(ix)     The term "Yield Maintenance Minimum" means the minimum for purposes of calculation of the Yield Maintenance Fee to be paid with respect to a Prepayment.

(e)     **Prepayment 5-4-3-2-1** means that, subject to the Prepayment Conditions, after making all scheduled principal and interest payments due hereunder and following any Prepayment Locked Out Period, the Borrower shall have the privilege of making any of the following payments of principal before such principal is due ("Prepayment Date") in multiples of $100 of additional sums to be applied in reduction of principal on any business day to be paid together with all interest accrued on the amount Prepaid: (1) the Borrower may make payments, without fee, provided the amount so paid in any calendar year (January 1 to December 31) shall not exceed ten per centum (10%) of the principal advanced hereunder and this right shall be non-cumulative; (2) in addition to any amounts paid under clause "(1)" of this paragraph, upon payment of a fee ("Prepayment Fee Percentage") calculated as follows:  (a) five per centum (5%) of the amount Prepaid if Prepaid during the first year after the date of this Note; (b) four per centum (4%) of the amount Prepaid if Prepaid during the second year after the date of this Note; (c) three per centum (3%) of the amount Prepaid if Prepaid during the third year after the date of this Note; (d) two per centum (2%) of the amount Prepaid if Prepaid during the fourth year after the date of this Note; (e) one per centum (1%) of the amount Prepaid if Prepaid during or after the fifth year after the date of this Note. "Subsequent Prepayment Fee Period" means each successive period following the First Prepayment Fee Period.  Notwithstanding anything to the contrary herein contained, in no event shall the Prepayment Fee be less than an amount equal to 1.00% of the outstanding principal to be Prepaid.  If there is a Prepayment Locked Out Period applicable to the applicable Loan, then each of the foregoing Prepayment time periods shall not commence until after the expiration of the Prepayment Locked Out Period.

(f)     **Prepayment 5-4-3-2-1-0** means that, subject to the Prepayment Conditions, after making all scheduled principal and interest payments due hereunder, the Borrower shall have the privilege of making any of the following payments of principal before such principal is due ("Prepayment Date") in multiples of $100 of additional sums to be applied in reduction of principal on any business day to be paid together with all interest accrued on the amount Prepaid: (1) the Borrower may make payments, without fee, provided the amount so paid in any calendar year (January 1 to December 31) shall not exceed the Prepayment Free Percentage of the principal advanced hereunder and this right shall be non-cumulative; (2) in addition to any amounts paid under clause "(1)" of this paragraph titled "Prepayment privileges," upon payment of a fee ("Prepayment Fee Percentage") calculated as follows:  (a) five per centum (5%) of the amount Prepaid if Prepaid during the first year after the date of this Note ("First Prepayment Fee Period"); (b) four per centum (4%) of the amount Prepaid if Prepaid during the second year after the date of this Note; (c) three per centum (3%) of the amount Prepaid if Prepaid during the third year after the date of this Note; (d) two per centum (2%) of the amount Prepaid if Prepaid during the fourth year after the date of this Note; (e) one per centum (1%) of the amount Prepaid if Prepaid during the fifth year after the date of this Note; (f) zero per centum (0%) of the amount Prepaid during or after the sixth year after the date of this Note. "Subsequent Prepayment Fee Period" means each successive period following the First Prepayment Fee Period.  If there is a Prepayment Locked Out Period applicable to the applicable Loan, then each of the foregoing Prepayment time periods shall not commence until after the expiration of the Prepayment Locked Out Period.

1.242     **Prime Rate** means for any day the highest rate published from time to time in the "Money Rates" section of *The Wall Street Journal* as the Prime Rate for that day (or, if *The Wall Street Journal* is not available, any other authoritative source of that rate selected by Lender).

1.243     **Prohibited Transfer** means:  (a) any sale, contract to sell, conveyance, encumbrance, pledge, Mortgage, or lease of the Collateral described in any Mortgage to or for the benefit of a Person not the original Borrower under any Mortgage, and not expressly permitted under any Mortgage or the other Collateral Documents, or other transfer of all or any material part of the Collateral secured by any Mortgage or any interest in it, including any transfer of Mineral Rights, Water Rights, or water stock, whether voluntary, involuntary, by operation of law or otherwise; (b) if Borrower is a corporation, any transfer or transfers of shares of the voting power or the direct or indirect beneficial ownership of Borrower; (c) if Borrower is a partnership, withdrawal or removal of any general partner, dissolution of the partnership under Applicable Law, or any transfer or transfers of the partnership interests; (d) if Borrower is a limited liability company, withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of the voting power or the ownership of the economic interest in the Borrower; or (e) if Borrower is a trust, withdrawal or removal of any trustee or revocation of the trust.

1.244     **Project** means that certain project more particularly described in an agreement from time to time entered into between Borrower and Lender in connection with Lender extending to Borrower, at Borrower's request, any Construction Line of Credit Loan.

1.245     **Project Assessments** means all fees for the issuance of the Permits, assessments, impact fees, capacity charges and other governmental charges and levies of any nature, required as a condition of the construction, occupancy and operation of the Project, as more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

1.246     **Project Budget** means all costs from time to time approved by Lender in connection with the Project, as more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

1.247     **Project Completion Deadline** means the deadline from time to time agreed upon between Borrower and Lender as to when Substantial Completion of the Project must be achieved, as more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

1.248     **Project Costs** means all costs actually incurred by Borrower in connection with the Project, as more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

1.249     **Project Inspector** means any inspector retained by Lender to inspect the Project, as more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

1.250     **Project Punch List** means a list prepared and certified by an engineer or architect or other Person acceptable to Lender, describing any incomplete work, uninstalled equipment or unperformed repairs required for final completion of the Project in accordance with the Plans and Specifications, as more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

**1.251**    **Rabobank** means Coöperatieve Rabobank U.A. (trading as "Rabobank"), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands.

**1.252**    **Rate Conversion** means the conversion of all or part of an applicable Loan into a Loan bearing interest at another rate at Borrower's election in accordance with the terms and conditions herein.

**1.253**    **Rate Request** means the request that Borrower must submit to Lender to request a Rate Conversion or LIBOR Rate Continuation, which request must specify the amount of the applicable Loan subject to the Rate Conversion or LIBOR Rate Continuation, the rate to be applicable to the applicable Loan, and if a LIBOR Rate Loan is selected, the applicable Interest Period, as more particularly described in a Facility Sheet or any amendment, modification or supplement thereto.

**1.254**    **Real Estate** means that portion of the Collateral which is real property, as opposed to personal property.

**1.255**    **Reinvestment Spread** means the percentage amount as used in calculation of the Prepayment Yield Maintenance.

**1.256**    **Related Payables and Liabilities** means all accounts payable including trade account payables or other unpaid costs of acquiring the Collateral included in the Borrowing Base, and the amount of all liens on and any offsets and contra accounts related or pertaining to that Collateral.

**1.257**    **RELOC** means any Loan secured by Real Estate and made by Lender to Borrower pursuant to the MCA or any amendment, modification or supplement thereto.

**1.258**    **Reportable Event** means any of the events set forth in Section 4043(c) of ERISA or in regulations of the Pension Benefit Guaranty Corporation issued thereunder, other than events for which the 30-day Notice period has been waived.

**1.259**    **Reporting Requirements** means all reporting requirements of Borrower set forth under the MCA, which shall be in effect until such time as all Obligations have been paid in full and Lender has no obligation to make any advance on the applicable Loan.

**1.260**    **Request for Rate Conversion** means the election of the Rate Conversion made by Borrower to Lender with no less than 30 days' Notice before the effective date of the Rate Conversion.

**1.261**    **Request for Advance** means each request made by Borrower, which request:

      (a)    **Irrevocable**. Shall be irrevocable,

      (b)    **Amount of Request**. Must specify the amount of the Request for Advance,

      (c)    **Specify Rate**. If Borrower may select from Optional Rates of interest, must specify the rate to be applicable to the applicable Loan,

      (d)    **LIBOR Period**. If a LIBOR Rate Loan is selected, the Interest Period requested therefore,

      (e)    **Time of Request**. Must be received by Lender before 12:00 noon (St. Louis, Missouri time):

            (i)    If the applicable Loan is to be a LIBOR Rate Loan, on a Business Day which is not less than two Business Days prior to the date of such Loan, and

            (ii)    In the case of any other applicable Loan, on a Business Day which is not less than one Business day prior to the date of such Loan.

**1.262**    **Revolving Line of Credit** means any Loan made by Lender to Borrower pursuant to in the MCA or any amendment, modification or supplement thereto.

**1.263**    **RNA** means Rabobank, N.A.

**1.264**    **Roads** means all streets, roads, entrances, easements and rights of way for the passage of motor vehicles, equipment and pedestrians.

**1.265**    **Schedule of Definitions and Covenants** means this Schedule of Definitions and Covenants, as may from time to time amend, modified, replaced or supplemented in Lender's sole discretion and marked as Exhibit A and incorporated in to the MCA.

**1.266**    **Secured Obligations** means any and all of the Obligations secured by any of the Collateral Documents.

**1.267**    **Security Agreement** means any document pledging, granting or creating a Lien or security interest in any personal property, now or hereafter entered into by Borrower in favor of Collateral Agent and encumbering all or any portion of the Collateral described therein.

**1.268**    **Security Instrument** means any Security Agreement, Mortgage, or Collateral Assignment, now or hereafter entered into by Borrower in favor of Collateral Agent and encumbering all or any portion of the Collateral described therein.

**1.269    Self Prepared** means for the financial statement of any Person, prepared by that Person, and not compiled, reviewed or audited by a CPA.

**1.270    Soft Costs** means all costs, other than Hard Costs, necessary for final completion of the Project, including without limitation, architects' and engineers' fees and expenses; management fees and expenses; Legal Fees and expenses; real estate taxes; survey costs; insurance premiums; ground rents; fees and contributions required by Governmental Authorities; utility extension or other charges or deposits for establishment of utility services; interest during the period prior to the completion of the Project in excess of the balance of any interest reserve included in the Project Budget; and the costs of tenant improvements, tenant allowances, and leasing commissions not included as a separate item in the Project Budget.

**1.271    Specifically Designated Nationals and Blocked Person List** means that certain list entitled "Specifically Designated and Blocked Person List" published by OFAC.

**1.272    Stabilized EBITDA** means EBITDA excluding nonrecurring, extraordinary items (includes "off farm income" if deemed to be recurring).

**1.273    Subsidiary** of a Person which is anything other than an individual means a business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly by that Person.  Unless otherwise specified, all references to a "Subsidiary" or to "Subsidiaries" shall refer to any Subsidiary or Subsidiaries, if any.

**1.274    Substantial Completion** means in Lender's sole discretion and more particularly described in a Facility Sheet or any amendment, modification or supplement thereto, the Project has been completed in accordance with the Plans and Specifications to the extent required to permit Borrower to use the Project for its intended purpose, and any incomplete work, uninstalled equipment or unperformed repairs does not in Lender's Judgment, materially affect the operation or market value of the Project.

**1.275    Swap Counterparty** means any party to a Hedging Agreement which is Rabobank or an Affiliate of Rabobank.

**1.276    Tangible Net Worth** means total assets, less the sum of (without limitation and without duplication of deductions) (a) total liabilities, (b) any reserves established by a Person for anticipated Losses or expenses, (c) the amount, if any, of all intangible items including any leasehold rights, the amount of any investment in any Affiliate or other entity including a Subsidiary, good will (including any amounts, however designated on the balance sheet, representing the cost of acquisition of business and investments in excess of underlying tangible assets), trademarks, trademark rights, trade name rights, copyrights, patents, patent rights, licenses, unamortized debt discount, marketing expenses, and customer and/or mailing lists, (d) all amounts due from employees, stockholders, and Subsidiaries; and (e) any other asset deemed intangible by Lender.

**1.277    Term Loan** means any Loan made by Lender to Borrower pursuant to the MCA or any amendment, modification or supplement thereto or any Conversion.

**1.278    Total Property** means the aggregate of all Collateral as that term is defined in all Security Instruments.

**1.279    Trade Receivables** means Eligible Accounts Receivable resulting from or due from customers for merchandise sold or services performed in the ordinary course of business.

**1.280    Transaction Documents** means the Loan Documents and all Hedging Agreements.

**1.281    U.S. Treasury Rate** means the interest rate yield on actively traded non-inflation-indexed U.S. Government Treasury Securities, Adjusted to a constant maturity equal to the specified maturity, as reported in Federal Reserve Statistical Release H.15-Selected interest rates under the heading U.S. government securities/Treasury constant maturities/Nominal.

**1.282    U.S. Treasury Reinvestment Rate** means the U.S. Treasury Rate which Lender determines could be obtained by reinvesting a specified Prepaid installment payment in U.S. Treasury Securities maturing on the Original Payment Date.

**1.283    U.S. Treasury Rate Loan** means a Loan or portion thereof which bears interest calculated by reference to the U.S. Treasury Rate.

**1.284    UCC** means the Uniform Commercial Code as adopted and in effect in any relevant jurisdiction.

**1.285    UCC-1** means any UCC Financing Statement (Form1).

**1.286    Utilities** means all utility services necessary for the operation of the Real Estate.

**1.287    Value** means the value as determined by Lender.

**1.288    Working Capital** means (a) current assets minus (b) current liabilities.

**ARTICLE 2 - Covenants**

**2.01    Financial Covenants:**

        (a)    **Capital Expenditures.**  Parties spends or incur obligations (including capital leases) to acquire fixed assets in an aggregate amount greater than the amount set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

     (b)      **Working Capital.** Parties shall maintain not less than the amount set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

     (c)      **Tangible Net Worth.** Parties shall maintain not less than the amount set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

     (d)      **Current Ratio.** Parties shall maintain a Current Ratio of at least set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

     (e)      **Debt Service Coverage Ratio.** Parties shall maintain a Debt Service Coverage Ratio set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

     (f)      **Debt to Tangible Net Worth.** Parties shall maintain a Debt to Tangible Net Worth set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

     (g)      **Debt to Total Assets Ratio.** Parties shall maintain a Debt to Total Assets Ratio set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

     (h)      **Interest Coverage Ratio.** Parties shall maintain an Interest Coverage Ratio set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

     (i)      **Cash Available for Debt Service.** Parties shall maintain an EBITDA equal to or greater than the amount required to pay interest and the current portion of amortization of principal on all Funded Debt, set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

     (j)      **Annual Reduction of Unpaid Balance of Loans.** Parties shall reduce the total aggregate unpaid principal balance set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet.

**2.02**    **Other Covenants:**

     (a)      **Change in Management.** A change in the present executive or management personnel of Parties.

     (b)      **Change in Ownership.** A change in the equity interest of Parties.

**2.03**    **Reporting Requirements.** Borrower shall furnish to Lender:

     (a)      as soon as available, but no later than the timing, frequency and type of reports set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet for applicable Parties' financial statements;

     (b)      as soon as available, but no later than the timing and frequency set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet for applicable Parties' tax returns, including all schedules and exhibits and any extensions of the filing date;

     (c)      within the timing and frequency set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet for applicable Parties' updated budget of projected income and expenses relating to Parties' operations;

     (d)      within the timing and frequency set forth in the Applicable Obligor Covenant Schedule or any such Facility Sheet for applicable Parties' financial projections for Parties' operations, specifying the assumptions on which they are based.